**GALVESTON, H. & S. A. RY. CO. v. BUTTS. (No. 6138.)**

(Court of Civil Appeals of Texas. San Antonio. Jan. 29, 1919. Rehearing Denied Feb. 26, 1919.)

1. MASTER AND SERVANT ☞265(9)—INJURY TO SERVANT — NEGLIGENCE — BURDEN OF PROOF.

In action for injuries sustained by plaintiff switch tender when thrown under a moving train, because of his stumbling over a pipe left by defendant in such position as to partially obstruct a path along the track, the burden was upon plaintiff to show that defendant was guilty of negligence that proximately caused the injury.

2. MASTER AND SERVANT ☞286(15)—INJURY TO SERVANT—NEGLIGENCE—QUESTION FOR JURY.

In action for injuries sustained by plaintiff switch tender when thrown under a moving train, because of his stumbling over a pipe left by defendant in such position as to partially obstruct a path along the track, question of negligence held, under the evidence, for the jury.

3. MASTER AND SERVANT ☞265(13) — ASSUMPTION OF RISK—BURDEN OF PROOF.

In action for injuries sustained by plaintiff switch tender when thrown under a moving train, because of his stumbling over a pipe left by defendant in such position as to partially obstruct a path along the track, the burden was upon defendant to prove that plaintiff knew of the obstruction and realized the danger.

4. MASTER AND SERVANT ☞288(2)—INJURY TO SERVANT—ASSUMPTION OF RISK—QUESTION FOR JURY.

In action for injuries sustained by plaintiff switch tender when thrown under a moving train, because of his stumbling over a pipe left by defendant in such position as to partially obstruct a path along the track, whether plaintiff assumed the risk held, under the evidence, for the jury.

5. MASTER AND SERVANT ☞265(14)—INJURY TO SERVANT—CONTRIBUTORY NEGLIGENCE—BURDEN OF PROOF.

In action for injuries sustained by plaintiff switch tender when thrown under a moving train, because of his stumbling over a pipe left by defendant in such position as to partially obstruct a path along the track, defendant had the burden of showing that no prudent person would have used the path in question at night when there was a clear path on the other side of the track.

6. MASTER AND SERVANT ☞289(15)—INJURY TO SERVANT—CONTRIBUTORY NEGLIGENCE—QUESTION FOR JURY.

In action for injuries sustained by plaintiff switch tender when thrown under a moving train, because of his stumbling over a pipe left by defendant in such position as to partially obstruct a path along the track, held that issue of contributory negligence was properly submitted to the jury.

7. MASTER AND SERVANT ☞217(5), 234(4)—INJURY TO SERVANT—KNOWLEDGE OF DANGER—PRESUMPTION.

As regards assumption of risk and contributory negligence, knowledge is presumed where the danger is so obvious that an ordinarily prudent person would have appreciated that it endangered his safety.

8. DAMAGES ☞134(3)—PERSONAL INJURIES—EXCESSIVE DAMAGES.

For injuries consisting of the crushing of a foot necessitating amputation of three toes and a part of the foot, impairment of eyesight, shock to nervous system, and impairment of general health, rendering plaintiff apparently unfit for work, a verdict for $18,500 is not so excessive as to show passion, prejudice, or other improper motives and influences, plaintiff being 27 years old, and earning $65 per month at the time of the injury.

9. DAMAGES ☞208(1)—DETERMINATION OF AMOUNT—PROVINCE OF JURY.

The amount of pain and suffering, the diminished capacity to labor, the probable permanency of suffering, the permanency of diminished capacity to labor, the efficiency of plaintiff shown by his long service, and the probable reward for such efficiency usually manifested by increased compensation, as well as his life expectancy, were all questions for the determination of the jury.

Appeal from District Court, Bexar County; R. B. Minor, Judge.

Action by Clarence W. Butts against the Galveston, Harrisburg & San Antonio Railway Company. Judgment for plaintiff, and defendant appeals. Affirmed.

Baker, Botts, Parker & Garwood, of Houston, and Templeton, Brooks, Napier & Ogden and Ed. W. Smith, all of San Antonio, for appellant.

Perry J. Lewis, Champe G. Carter, Randolph L. Carter, and H. C. Carter, all of San Antonio, for appellee.

SWEARINGEN, J. This is a suit by the appellee, Clarence W. Butts, against the Galveston, Harrisburg & San Antonio Railway Company to recover damages for personal injuries suffered by him through the alleged negligence of appellant, which answered by general and special exceptions, a general denial, and special defenses.

A verdict was found by a jury in answer to special issues, upon which judgment was rendered for appellee for $18,500.

We adopt appellant's statement of the issues made by the pleadings:

Plaintiff was employed by defendant as switch tender, and in the discharge of his duties as such was walking in a path alongside the track furnished by defendant for the use of its employés in doing their work, and stumbled over a large metal pipe negli-

gently placed and left in this path by defendant, and was thrown under a passing train and injured. It was defendant's duty to furnish plaintiff a safe place to do his work in, but, in disregard of this duty, defendant negligently placed and left the pipe so close to its track as to endanger its employés walking beside the track in the space used for such purpose, and while using this space in doing his work plaintiff stumbled over the pipe. The act of negligence complained of by plaintiff on which he based his cause of action was stated by him as follows:

"The plaintiff says that he was in the discharge of his duty, and that the defendant's said negligence in causing or permitting said pipe to be so close to the track on which its train was moving, as aforesaid, directly caused the serious injuries hereinafter set out, without any fault on the plaintiff's part."

Plaintiff alleged his injuries to consist of the crushing and mangling of his right foot, necessitating the amputation of three of his toes and a part of the foot, impairing the use thereof, and the condition of the foot necessitating a second operation to remove additional bone, flesh, and nerve; that plaintiff fell with great violence, injuring his back and spine; that as a result of the injuries plaintiff has suffocating spells and sleeplessness, and his eyesight has become impaired, his nervous system shocked and injured; that he is very tremulous, and his general health and strength greatly impaired; that his injuries are permanent, and have caused plaintiff to suffer great mental and physical pain, and will so constantly afflict him for the balance of his life; that prior to the accident plaintiff was a strong, healthy young man, with an average earning capacity of about $75 per month, which he reasonably expected to increase in the future, but that since his injuries he has been unable to work, and will be a cripple and invalid for the balance of his life, to his damage $30,000.

In addition to general and special exceptions and general denial, defendant pleaded—

"(1) Contributory negligence; that is, that some weeks prior to the accident it placed a load of pipe alongside and near its track, to be used in relaying its oil pipe line, which was a proper and necessary work and improvement, and that this pipe was placed north of, and about parallel with, the track, and at irregular distances therefrom, on each side of plaintiff's shanty where he was stationed, and that plaintiff knew where the pipe lay, and knew the whole situation, and of the danger to him (if any) incident to the situation; that defendant had no reason to anticipate injury to plaintiff by reason of the pipe being there so long as plaintiff exercised ordinary care in the discharge of his duties; (2) that defendant was engaged and plaintiff was employed by it in interstate commerce, and that plaintiff assumed the risk; (3) that if plaintiff was suffering or had suffered with any of the ailments complained of other than injuries to the foot, same were not caused by injuries received in the accident, but were due to disease and other causes beyond the control of defendant."

The material facts are: Appellee was an employé of the appellant, and at the time that he was injured he was performing the duties of his employment. These duties were those required of a switch tender. His work began at 6 p. m. and ended the following morning at 6 a. m. At 9 o'clock on the night of February 28, 1917, this injury occurred. As the first eight assignments depend upon the proposition that the evidence establishes as a matter of law that the appellant was not guilty of negligence, or, if so, that appellee assumed the risk or was guilty of contributory negligence that was the proximate cause of the injury, it will be sufficient to state only so much of the evidence as may sustain the findings of the jury upon each of those issues, all of which were submitted to the jury. We will therefore state the testimony of appellee himself, a part of the testimony of the day switch tender, that of the end switchman to whom appellee called that the road was clear immediately preceding the injury, and the testimony of the section foreman who placed the obstructing pipe in the north pathway, as well as the testimony of the material engineer, who gave exact measurements showing that the line of pipe was arranged with the object in view of leaving a clear path on the north side of the track. This witness shows that the length of pipe over which appellee fell was intended to connect the line of pipe over a wooden bridge. It was not on the bridge at the time, but this piece was laid alongside another piece of pipe on the east of the bridge. Thus there were two pieces of pipe instead of one at the place of injury. The east end of this extra length of pipe projected towards the track, leaving 39 inches of clear space between it and the track.

The appellee, after stating that the switch engine with a string of coaches came to the switch tracks where he worked every night at 9 o'clock, testified:

"I went back to my shanty, and when they whistled I looked to see if the block system was clear before I could let them out, and I looked and seen that the light on the block system was out, and I could not tell whether there was a train coming or not, and, of course, I had to walk down to see whether it was clear, and after I got close to it I could see that it was clear, and I gave them a signal to come on. They were running east and I was going west. I was going back to the shanty to throw another switch after they got into the clear; they were supposed to go back down the main line with these cars. The cars approached me first —there were a number of cars in the train, and the engine was on the end opposite from me.

The cars were backing toward me, and the train was coming east. Therefore I had to get off the track in order to allow it to pass, and I continued on my course up the side of the track. When I stepped off the track I hollered to the switchman on the car, 'All right,' and that the block was out, but it was clear, and I continued walking on past back to my switch. I was in a hurry about that work; there was a Katy passenger due there, and I wanted to get this string of cars out of the way to let the Katy out, and I went on then for the purpose of throwing my switch to let this train out. This was a Galveston, Harrisburg & San Antonio Railway Company train. In walking fast I stumbled over a pipe, and fell very hard and got hurt. I was walking in the path between the pipe and this string of coaches that were passing. There was a lot of pipe on the edge of the embankment. Those pipe had been there for several days. The pipe that caught me was not one of the general line of pipes on the edge of the embankment; it was one that was thrown right in the path, and that was the pipe that caught me. That pipe was a twelve to fifteen-inch pipe—it was a very large pipe. When I fell, I fell on this pipe face down, and rolled off on my left side and over on my back, and in rolling over I suppose that my leg flopped over and the wheel caught it—my foot was caught under the wheels.

"I was on the north side of the track, going west. I had a green light which I used to signal trains with me, and when I fell the light was broken. These cars came on out, and one of the switchmen lined up the switch, and they started back down the main line."

On cross-examination he testified:

"I always worked at nights. * * * Mr. Pearson worked in the daytime when I got hurt —before the accident. He was on from 6 in the morning until 6 in the evening, and I was on from 6 in the evening until 6 in the morning. When I went on duty at that time of the year it was just about sundown.

"Yes, sir; I had, seen these pipe before the time of the accident. I just noticed them there about four or five days. I had noticed them only the last four or five days. * * *

"This string of cars were in the yards, and when I went back they were coming out of the yards—coming out of the yards towards me— they had just whistled for that. The engine was on the far end. They had about fifteen or seventeen cars—something like that. This same move was practically made every night. That was equipment for trains coming down to the San Antonio depot every night. And when I saw the block was clear, this string of cars was coming back towards me, and I gave them a signal as soon as I saw the block was clear, and then turned around back west towards the shanty. The semaphore is on the south side of the track. I was going back to line another switch up for them—the main-line switch. The main-line switch was located west of my shanty on the south side of the track, and it was my purpose to go back there and throw that switch to let that string of cars go back towards the depot. I was to get back there as quick as I could. It was my duty to throw that switch, and I always threw it.

"If the necessity arose to throw the switch,

and I should be somewhere else in the yard—for instance, down at the Katy main—the switchmen would throw it in my absence; and I had to throw another switch farther down for the Katy passenger, to let them get out from San Antonio and go on north. That switch was farther west on the south side of the track. The semaphore and those two switches that I expected to throw were all on the south side of the track. * * *

"In going down to the semaphore I walked down the center of the track, and saw it was clear, and started back, and walked back and met this train of cars coming east towards me, and I got off the track onto the north side for the purpose of letting this train of cars pass me. When I got off the track onto the north side, then I intended walking west towards the shanty. I expected to throw this switch to let these cars go back down into the yards. * * * That switch that let that string of cars go back down into the yards was on the south side, and the semaphore is on the south side.

"As to why I did not come back up on the south side of the train then; I seen that this switchman on the back end was on that side of the car—on the north side—and I wanted to holler to him that the block was clear, and, naturally, stepped to the right side. * * *

"I had been noticing those pipe there four or five days. * * * They were scattered along the inner edge of the bank, and left a path there to walk on. * * * I always used the center of the track. I didn't pay any attention to what was on either side. I knew, however, that there was a string of pipe on the north side there. I hadn't seen any pipe on the south side there. * * *

"This was a very dark night. * * *

"I was going back up from the semaphore toward the shanty to throw the main line switch to let this string of coaches back to the depot. That switch is located just opposite and across the track from my shanty. And if I had gotten back up there I would have had to cross back from the north to the south side, to throw that switch. And then I expected to go on farther west to throw the switch to let the Katy passenger train out. It was due out at 9, and come out past this in about eight minutes. Yes, sir; they had showed up at this time—I seen the headlight and recognized that as the Katy train coming up.

"Yes, sir; I expected this switch crew to hold this string of cars until I came from the semaphore back up to that switch. * * *

"At the time of the accident the train was moving east. It had not stopped for the purpose of moving back into the yards; it was still moving east. They wasn't going very fast. I was walking very fast; I was not running. I had a green lantern with me. That doesn't throw much light—does not throw enough light to see where you are stepping or to locate a switch with. It is purely and solely for the purpose of signaling trains.

"During the preceding years, except for that seven months I laid off sick with this attack and the time I went down in the country to visit my sister, I was working steadily all the time. * * *

"* * * I had three main-line switches to take care of. Beginning on the east, there was a switch connected with the east main line, and

the other switch connected with the west main line and lead switch, and the other switch with the Katy. The first two were the east and west main line, which were west of the bridge and my shanty, and west of where the accident happened, and the Katy switch I spoke of was down east of the shanty about a city block—about three hundred feet. My shanty was just west of the bridge over Menger creek. The west main switch was right across from that switch, I suppose.

"I fell a short distance east of the bridge—about thirty feet east of the east end of the bridge. * * *

"My duties lie mostly west of the shanty, on the opposite side of the track. I was running up and down there nearly all the time. I had no other duties to perform besides attending those switches and answering the telephone. In letting in a train or letting out a train, I would show the hour it passed and direction it was going, and throw the switches for them, and answering the telephone. That consisted of my duties as switch tender. I had been in that employment close to seven years, except for those two periods that I have mentioned."

### Redirect examination:

"I said that ordinarily in doing my work I used the center of the track, and it was only when the trains would push me to one side that I would take the one side; we always used the center of the track, and it was very seldom we got caught with a train passing.

"This pipe that I spoke of, it seemed as though the end of my shoe caught the pipe—into the hollow part of it. In doing my work up there it had to be done quickly; you had to move very quickly to keep from delaying any of these passenger trains.

"It was not my duty to watch the sides of the track to see about pipes that might be put along there. This pipe that I struck was right in the pathway, and it was between the line of pipes that was on the edge and the railroad track. I had never noticed this pipe lying there until after I stumbled on it. * * * I don't know how long those pipes had been there—I kept no account of that—but I know that I had noticed a line of pipes there lined up on the edge of that embankment."

### Redirect examination on rebuttal:

"The situation of those switches that I had charge of, there is one west of the shanty about sixty feet from the one opposite the shanty. Those are two main line switches, and then you go east about a hundred yards or such matter and you strike the third switch. That is the Katy switch, and that stands up by the block signal, just the other side of the block signal. * * *

"* * * When I discovered that the block was clear, I signaled the train to come on, and then I started walking back to the shanty. The train was still coming east in response to my signal. I was going back to line up another switch after they got out far enough to go back into the main line. I had my switches lined up so that they could get out, and I had to go back and change them. The train was then leaving the vicinity of my shanty and going in the direction of the block signal, and it was then

my duty to go back and throw those two switches. The first one I would get to was opposite the shanty. I would attend to that one first—I would throw that for the coach drag to go back to the depot on the main line; in other words, just as soon as they pulled up there, then they would go right on down to the depot. Then the farther switch that was west of my shanty about sixty feet, I had to line that up for the Katy passenger, which was in sight then; I saw the reflection of the light. Then after I had lined up that switch for the Katy to come out, I had to line up the one right opposite the shanty there, for the main line. My next move then was to go down to the Katy switch, about a hundred yards, quickly, and throw it so that the Katy train would come right through and not stop. That was the movement that I had to make there. * * *

"I said that both sides of the track there on that dump, and the track itself, was used by employés in walking to and fro, in attending to their business. At the time I was hurt the center of the track was the best walking at night, because a man was in danger of falling down the banks all the time, and I used the center of the track.

"The switchmen give their signals to the engineer on the south side of the track. Switchmen do get over on the north side of the track when there is no signal to be given; switchmen do all their work on the south side of the track —the engineer is always on the south side; but we are not switchmen—our engineers going west are on the north side, and we have trains coming off the Katy, and the engineer is on the north side, and trains going east the engineer would be on the south side.

"Trains stop there and are delayed at that point very often; and trains going west, the trainmen get off lots of times, and give signal work, and walk up and down both sides of that track in the discharge of their duty. * * *

"When I came to meet that train, the train was backing east and I was walking west, and as I saw the train coming I seen the light of the switchman on the back end, and it appeared to be held on the north side of the track. In stepping to the north side of the track, I turned to my right, and as the train passed me I hollered to him the condition of the block. As to any other reason for my being on the north side of the track, we have a Katy track that branches off to the north, and if I had been on the south side of this string of cars I couldn't tell whether there was a Katy train coming in or not. And there was a Katy train going out then, and the Katy train would have to come in this way, and it would meet this train that was just going out. And being on the north side, I could see whether or not the Katy train was coming in there—I could see the reflection of the headlights; and if I had gotten across altogether, I couldn't have seen that. The block system did not work off the Katy—they have no block system. No, sir; it wasn't exactly my duty to see that there was no trains coming from the opposite direction before I let this train go out; lots of times they wait there for trains coming in. If I saw a train coming, the train going out would have waited to have orders; if I saw a train coming in, I wouldn't have lined up my switches for the passenger train going out."

Cross-examination:

"Katy trains are coming in there all hours of the night, and I would go down and throw the Katy switch. They would always wait for me to throw that switch before they would come in on the G., H. & S. A. Generally I would go down the center of the track.

"Yes, sir; I had a slight recollection of having seen these pipes being lined up on the edge of the embankment on the north side of the track before the accident. I had not walked over there since the pipe had been there; I always used the center of the track. I had not walked on the other side for some time. We are always ahead of the train.

"I was going back at this moment for the specific purpose of throwing those switches west of the bridge, on the south side. * * *

"Q. For instance, this crew operating there that night, if they reached the switch and you were absent for any reason, they would not just sit there and wait until you came up and threw the switch? A. Well, if the man wasn't busy they would.

"They wouldn't always wait until I come back and threw the switch; they have throwed it several times, and they threw it this night in my absence. That switch is on the south side. As that train shoved back towards me as I was down by the semaphore. I testified that I couldn't see the switchman standing in the center of the rear coach—I saw his light. I did not testify 'that he was over on the left-hand or north side of the train. I said his light showed more on that side. I could not tell whether his light was sitting down or who was holding it. Anyhow, it appeared a little more to the north than to the right, and I assume that he was standing in the center of the train having [leaning] over that rail that crosses the end of a coach; and I was walking back at the time of this accident for the purpose of throwing those two switches west of the bridge, both of which are located on the south side of the train. The engineer was located on the south side of the train that night, and usually was. Switch engines usually face east.

"I had been working for the G., H. & S. A. at the time that this accident happened, close to seven years, off and on. I don't remember when I began work for the G., H. & S. A. The only position I ever held was switch tender, and I put in most of the time I put in out there at Menger creek. * * *

"If I know any train is coming in from the north, I first line up the switches on the west of the bridge, and then go down and line up the Katy switch; that is always true. You can see the reflections of those Katy head-lights from the switches west of the bridge. We generally have a list of what is coming. When a Katy train is coming in, and I have a tip it is coming in, when I see the headlight, or for any reason I expect it in and go throwing switches, the first thing I do is to line up the switches west of the bridge before I go down to the Katy switch and let the Katy train in. You have got to see whether the block is in danger or not. The block is not on the Katy, but you can't let a Katy train through a road block; in other words, until the G., H. & S. A. block says 'Ready' the Katy train has to wait. But then if the block is clear, and I am getting ready to let the Katy train in, I always line up the switches west of the bridge before I go down and let the Katy train in on the G., H. & S. A. track, so that when they come in on the G., H. & S. A. track they have a straight shot to the depot. That is not the invariable rule. If there are a lot of other engines switching around there, you are going to wait until they get out of the way, and there is no exception to that rule. * * *

"As to the number of times I went down to that switch from the time I went on in the evening until I quit work, sometimes I went down there a dozen or more times, and sometimes more. I might say I went down there at least a dozen times every day I worked. I don't know whether I passed there seven hundred and twenty times or not; I never figured it. I had been down there a good many times."

Redirect examination:

"I was going toward those switches that had to be thrown when I was hurt, and the train was going away from me—so that I was to mind about the switches. The train crew was leaving the switches and I was going to them, so it was clearly my duty to throw them. If I had not attended to letting in that Katy that was coming in there, the train would have to stop. Those trains are supposed to go right on through; and I was going to throw the switch to let out the string of switch cars to the main line, and was closer to that switch than any of the crew, and I had to throw the switches unless that train would stop."

Recross-examination:

"I was looking for the Katy to come out from San Antonio, going north. Along there it would be practically east—the track along there runs east and west; and I was going west to throw those two switches west of the bridge. I was going along on the north side of the track, and there was a train between me and the south side of the track. The switches were on the south side of the track. Yes, sir; I had duties to perform on the north side of the track before I finished that job I was going to work on right then. I was in a hurry to throw those switches—get back up there; but I had hollered at the switchman that the light was out and the block was clear, so that he wouldn't stop. I had to throw those two switches on the south side of the track before the Katy train could come up. In order to throw the switches I would have to cross from the north side of the track to the south side of the track.

"The pipe was scattered along the north side of the track. I suppose the walk or pathway on the south side of the track was clear. Prior to that occasion that was the first time I happened to get on the north side of a train in several months, I suppose."

The day switch tender, J. A. Pearson, testified:

"* * * There was a beaten path right along both sides; it was filled up nicely for the switch tender to travel on, and both sides were used by trainmen and switchmen in the discharge of their duty. The only reason that I hadn't used the north side was because the pipe had absolutely taken up the place of the public; that's about right, it destroyed that path, in my esti-

mation, and I took the good side of the track. Those pipes were lying pretty close to the ties—I don't know exactly—possibly a foot or two from the ties, approximately, on the path. They weren't lined up in perfect straight order on the crown of the dump. Possibly it is so that there was one place there where there was two pipes, just about the bridge. I don't know; I didn't notice that there were two pipes lying there on top of each other, sideways or any other way."

W. T. Baird, the switchman on the east end of the train at the time of the injury, testified:

"These switch tenders, it was their privilege and they would have a right to walk on the track, middle of the track, or either side of the track, I guess. * * *

"I say that Mr. Butts was walking west, and our train was backing up in the opposite direction going. No, sir; he wasn't walking in the middle of the track when I first saw him; he was walking on the north side of the track. And when I passed him he told me that it was clear; says, 'The light's out, but the semaphore is all right.' And I was standing then on the back of the train just about the middle of the platform—just like there is a gate there. You have seen those tail gates on a sleeper; I was leaning on that looking right down the track. Yes, sir; I had a lantern, and my lantern was lit. * * *"

The defendant's section foreman unloaded the pipe from a moving car onto the north side of the track, and, after unloading, this witness went back and rolled the pipe out of the north path out to the north edge of the embankment, which left a clear path of about six feet between the line of pipe and the north rail of the track. He further testified:

"I distributed pipe from the oil tank back west to the roundhouse. That was either along about the last of December, 1916, or the first of January, 1917."

Cross-examination:

" * * * The pipe was there in January and February. It was taken away the next day after it was unloaded. It lay there during January and February. * * * I didn't lay any on the bridge. * * * While dropping it off of the car it may have broken that plank sidewalk on the bridge. I laid a double line west of the bridge, and there was also a few pipe east of the bridge. When it was constructed it was a straight line. There was a double line east and west of the bridge. I guess that pipe laid there before the construction; it might have been probably thirty or sixty days before they began construction of the pipe line.

"Q. When was it used in the construction? Don't you know it was taken away the day after Mr. Butts was hurt? A. Well, it was not taken away; it was just rolled away from where it was unloaded. * * *

"It was moved before he got hurt—it was just rolled into the clear at the crown of the hill. * * *

"There were two pipes at the point where he got hurt; one of them was over at the edge of the fill, and the other was right against it. I put them there myself—had it put there. On the particular night he was hurt it didn't seem to have been moved from where I placed it. I found it there the next day. I heard about the accident; they told me about him getting hurt upon this pipe, and I went back there and saw where this pipe was, and it was right up against the other pipe. I knew that a man had stumbled on it and been hurt, and I did not move it—left it right there. Somebody else could not come along and be hurt in the same way—not where the pipe was lying. The crown of the dump is four feet six inches. That dump has not been added to since he got hurt. From the north rail the dump is about six feet. I will swear to as much as six feet; yes, it could have been more feet. It is a standard distance all the way along there. Yes, sir; I have measured it.

"A passenger car projects over the rail about eighteen inches to two feet. These pipe were about eight-inch pipe, and there was two of them lying right together at the point where Mr. Butts was hurt. The space here by the side of these tracks was leveled up, and it was for the use of trainmen and employés to walk on; they had been using it. I know that men have to do work on a certain side of the track in switching, and the reason the dump was made, or so made, the men could work on each side of the train.

"I put these pipe and left them there for about two months. I put them there so the pipe line could be constructed. Yes, sir; you have to lay down pipes right in the pathway where the trainmen might have to work at least two months before we used that material."

L. E. Moursund, who had charge of material on construction jobs, testified:

"With reference to the two pipe lying just east of the bridge, over one of which plaintiff claims to have stumbled, that the west end of the pipe next to the north rail is thirty-two inches from the north rail, and the east end (over which the evidence showed plaintiff stumbled) is thirty-nine inches from the north rail, and that it is three inches from the end of that pipe to the next pipe east, that it is thirty-nine inches from the east end of that first pipe to the north rail, and forty-one inches from the west end of the pipe next to it to the north rail. The east end of the pipe next to it, two inches closer. * * * I made this map; I took the measurements myself. I am working in the engineering department. I went out there at 2 o'clock the day after the happening. Mr. Worthington, the superintendent, sent me out, and told me to take these measurements—the exact location of that pipe. I don't know that he informed me which pipe he stumbled over; he just said to get the location of the pipe. After I got the location of the pipe, no changes whatever were made. They were not allowed to lay right in the same position they did before the man was hurt—they moved them back a little bit—just straightened them up, that was all. I couldn't say why they made that change; just naturally moved them, that was all. I did not order that done; I don't know who ordered it moved; I just know it was moved. * * *

"I stated that the inside pipe where those two doubled next to the bridge was the closest to the north rail—the west end of the inside pipe is

closest to the north rail—that is, the end of that pipe next to the bridge. The west end of the inside pipe is thirty-two inches from the north rail, and the east end of the same pipe (in the hollow of which plaintiff's foot caught) is thirty-nine inches from the north rail. There are quite a few other pipes closer to the north rail than the east end of that pipe; there are seven ends of pipes closer than that to the north rail. The second pipe east of the pipe I spoke of is forty-one inches; that is the next one to it. The next one is thirty-five and thirty-three—the east end is thirty-three and the west end is thirty-five inches from the north rail. The third pipe from the west inside pipe is thirty-six inches at both ends. The fourth pipe from the west inside pipe is thirty-five inches on the west end and forty inches on the east end. The fifth pipe from the west inside pipe is sixty-six inches on the west end and forty-seven inches on the east end; the sixth pipe is thirty-four inches on the west end and thirty-seven inches on the east end. Both ends of that pipe are nearer to the rail than the east end of the inside west pipe."

It thus appears that there was a path between the rails, and also a path on each side of the track for the use of employés in the performance of duties for the appellant. These pathways were customarily used by the appellant's employés, and had been during the seven years that appellee had been employed as switch tender for the company at and near the place he was injured. The path on each side of the track had been kept clear of obstructions during all the seven years, except that beginning December 23, 1916, and ending January 1, 1917, the appellant threw 10-inch iron pipe on the north side of its tracks, with which to construct an oil-pipe line for its own use. This pipe was arranged parallel with the north track, and arranged in a line so as to leave a clear path between the line of pipe and the north rail of the track. For at least seven years the width of this path on the north side had been about six or eight feet. The line of pipe was somewhat irregular, but was a general line, leaving a clear path for employés. However, immediately east of a wooden bridge a second length of the pipe was inside of the line. This extra length of pipe inside of the general line of pipe was so situated that a person following the general line of the pipe would naturally strike this inside length of pipe. At the time of the injury this line of pipe and the extra length of pipe inside the line had obstructed the path for several weeks. Appellee knew in a general way that the pipe had been placed along the north side of the track in such way as to leave a clear path. Appellee did not know that this extra length of pipe was laid inside the general line of pipe. It was over this extra length of pipe immediately east of the bridge that appellee stumbled and was injured by the moving train.

The first eight assignments assail various rulings of the court, for the reason urged that the evidence established as a matter of law that appellant was not guilty of negligence, that appellee assumed the risk, and was himself guilty of contributory negligence that proximately caused his injuries.

The rules of law applicable to these facts furnish an issue that is presented to us with marked ability.

The contention of appellee is that it was the master's duty to furnish the appellee with a safe place to work, and that it was not his duty to inspect the path; that appellant made the place dangerous by placing obstructions in the path which appellee was to use hurriedly at night.

Appellant admits that the master owed appellee the duty to furnish him a safe place to work, and that it was not the duty of appellee to inspect, but contends that the pathway on the south side of the track was clear of obstructions, and because it provided appellee with this clear path it performed its whole duty to appellee, and was not negligent in placing obstructions in the path on the north side. Appellant also contends that, even if it were negligent in placing obstructions in an old and previously safe path, yet that appellee knew of the obstructions and the danger incident thereto, and his voluntary election to use the obstructed path instead of the clear path on the south side was an assumption by him of the hazard. Appellant insists that appellee was engaged in an interstate shipment when injured, for which reason the federal law, and not the Texas statute concerning assumed risk, governs.

The third contention made by appellant is that no ordinarily prudent person would, under the circumstances of this case, have attempted to use the path on the north side, knowing that it was obstructed, and that the path on the south side was clear.

[1, 2] The burden of proof was upon the appellee to maintain that appellant was guilty of negligence that proximately caused the injury, by partially obstructing the north path, even though the south path was left clear. The test here was from the evidence to determine whether or not an ordinarily prudent person, under all the circumstances, would have obstructed the north path as appellant did. In considering this issue it is proper to determine the result of only partially obstructing the habitually used north path instead of completely closing it. It is not necessary to detail the testimony, for it is certain that the situation was such that reasonable minds could draw different conclusions from it, thus conclusively showing that the question of the appellant's negligence was a question of fact for the jury to determine, and not a question of law. This issue was submitted to the jury, which found that appellant was guilty of negligence.

But conceding that the company was negligent, appellant insists that appellee knew the exact situation and appreciated the risk, and with this knowledge undertook to use the dangerous path instead of the safe one. There is no evidence to conclusively charge appellee with appreciation of the danger from the obstructions. The company's foreman testified that he endeavored to so arrange the line of pipe as to leave a clear path between the pipe and the north track, and his evidence will support the inference that he believed that the path on the north side was safe for use after he had arranged it with that end in view. This witness knew the exact width of the embankment, the track in the middle, and the passways on each side. He also knew the width of the cars. Appellee himself testified that he knew in a general way, that a line of pipe was placed along the edge of the embankment; but as he rarely used either side of the track, and then only at night, without a light, he did not realize the danger of the obstructions, and he testified that he did not know of the obstruction caused by the extra length of pipe out of its line over which he stumbled.

[3] The burden was upon the appellant to prove that appellee knew the obstruction was in the path, and that he realized the danger thereof. The only proof was that appellee knew, in a general way, that the line of pipe was laid beyond the path. There is much evidence introduced to prove that he ought to have known. For instance, that he passed within a few feet of the line of pipe repeatedly from 6 p. m. until 6 a. m.; that others noticed the line of pipe, and that appellee was an experienced employé.

[4] The most that can be said for the evidence upon this issue is that it was sufficient to be considered by the jury as it was. The evidence does not establish as a matter of law either that appellee did assume the risk or that he did not.

[5] The burden was also upon appellant to prove that, conceding its own negligence, yet that no ordinarily prudent person would have used the north pathway with its obstructions at night alongside of a moving train, when there was a clear path on the south side much more convenient for appellee in the performance of his duties. As stated by Mr. Justice Hawkins in his dissenting opinion in the case of Ry. v. Petty, 211 S. W. ——, it is easy to determine after the injury which was the safer way. But the question to be determined was, would a reasonably prudent person in appellee's situation, with his knowledge of the condition of the two paths, have acted as he did prior to the injury? Omitting the knowledge acquired from the injury itself, the evidence does not conclusively show that no prudent person would have attempted the north path. As on the issue of assumed risk, the evidence was such that reasonable minds might differ upon the conclusion to be drawn therefrom. The path was habitually used and had been for at least seven years. A path had been left between the north rail and the line of pipe which, in the opinion of the foreman, was wide enough. Appellee did not know of the extra length of pipe out of the line, and with such actual knowledge as he is proven to have had may have relied upon his master's maintaining the path furnished in a safe condition.

[6] The issue of contributory negligence was properly submitted to the jury. As stated in the beginning of this discussion, there is no difference between these parties as to the general rules of the law of master and servant. The difference is that appellant believes that the evidence establishes as a matter of law that it was not guilty of negligence, but that, conceding it was, still the evidence established as a matter of law that appellee assumed the risk or was guilty of contributory negligence that was the proximate cause of the injury, either or both of which would absolve the appellant from liability. Appellee, on the other hand, contends that there was evidence upon all three issues that required the verdict of a jury. A careful consideration of the cases cited by appellant sustains appellee's views of this case. The case cited by appellant which is most similar in its facts to the case at bar is that of Railway v. Mathis, 101 Tex. 342, 107 S. W. 530. The negligence there alleged was that the path was dangerous because there was no light furnished by which the turntable could be discovered and avoided. The employé in that case admitted that he knew the location of the turntable, and knew that it was dark, when he essayed the hazardous route. The darkness permitted by the master in that case is the negligence charged. In this case the negligence is that appellant placed partial obstructions, and permitted them to remain in the path habitually used by its employés while performing their duties. It cannot be said that the evidence in the case at bar shows that appellee knew of the obstruction or apprehended the danger therefrom, or that he must be necessarily charged with knowledge of either the obstruction or the danger thereof. The evidence made the question one of fact. All decisions hold that knowledge of the danger is necessary both for assumption of the risk and for contributory negligence.

[7] Of course knowledge is presumed when the danger is so obvious that an ordinarily prudent person, under the circumstances, would have apprehended that it endangered his safety. The cases relied upon by appellant are: Patton v. Gas Co., 108 Tex. 321, 192 S. W. 1060; Ry. v. Mathis, 101 Tex. 342, 107 S. W. 530; Ry. v. Hynson, 101 Tex. 543,

109 S. W. 929; Rogers v. Ry., 76 Tex. 503, 13 S. W. 540; Ry. v. Bradford, 66 Tex. 732, 2 S. W. 595, 59 Am. Rep. 639; Ry. v. McCarthy, 64 Tex. 632; Webb v. Ry., 27 Tex. Civ. App. 75, 65 S. W. 684; Ry. v. Lempe, 59 Tex. 22; Ry. v. Lewis, 133 S. W. 1086; Crawford v. Ry., 89 Tex. 89, 33 S. W. 534; Holt v. Railway, 160 S. W. 327.

Some of the decisions holding that it is the master's duty to maintain a clear path are: Railway v. Toliver, 37 Tex. Civ. App. 437, 84 S. W. 375; Ry. v. Miller, 191 S. W. 374.

Some of the decisions holding that a general knowledge of the location of obstructions does not necessarily prove that the employé apprehended the danger either in fact or as a presumption are: San Antonio & Aransas Pass Ry. Co. v. Engelhorn, 24 Tex. Civ. App. 324, 62 S. W. 561, 65 S. W. 68; G., C. & S. F. Ry. Co. v. Darby, 28 Tex. Civ. App. 413, 67 S. W. 446; Orange Lumber Co. v. Ellis, 105 Tex. 363, 150 S. W. 582; T. & P. Ry. Co. v. Swearingen, 122 Fed. 193, 59 C. C. A. 31; T. & P. Ry. Co. v. Swearingen, 196 U. S. 51, 25 Sup. Ct. 164, 49 L. Ed. 382.

[8] The ninth assignment is that "the verdict of the jury in favor of plaintiff for $18,500 is so grossly excessive as to manifest that it was the result of passion, prejudice, or other improper motives and influences, and there is no basis, in fact or law, for such verdict."

The appellee, while walking rapidly, stumbled and fell hard, was frightened, his cheek was bruised, his foot was crushed by a moving train. He was unable to get up. His fellow servants, coming to his rescue, found him trembling like he had a chill. Appellant's employés carried him to a hospital, where he was given medical attention. The bruise on the cheek disappeared after a week. The great toe and the two next to it on the injured foot were amputated on the night of the injury, February 28, 1917. The appellee remained in the hospital under treatment of physicians selected by the defendant for about one month, a part of the time in bed, most of the time in an invalid's chair. The foot failing to heal, in June, 1917, the same physicians deemed it necessary to perform a second operation, when it was found that the broken bones of his toes had worked out through the flesh at the bottom of the foot, and required the amputation of all the three injured toes back to the first joint. The wound healed slowly. After this second operation, in June, 1917, the trembling of the hands and body was as severe as at the time of the injury. A haze seemed to be over his left eye, while his right eye was almost sightless. For this eye trouble appellee was treated by an eye specialist selected by the defendant. Appellee's head and back constantly ached. The leaders of his right leg became cramped, causing pain and suffering. This condition continued unchanged up to the day that appellee testified in this case, more than a year after the injury. The condition of appellee at the time of the trial is described by one of appellant's expert witnesses in the following language: "He is apparently utterly unfit for work in the condition he is in now."

The only evidence that tends to contradict this description of appellee's serious condition at the time of the trial was the somewhat dramatic apostrophe of appellant's chief surgeon: "That he never saw plaintiff look any better than he does now; he certainly looks good now—certainly has his weight." The jury did not accept this optimistic version.

All of the ailments, except the amputation of the foot, may, for convenience, be referred to as neurasthenia, a term suggested by the physicians who testified as expert witnesses. There was ample evidence for the jury to find that appellee was suffering from this neurasthenia at the time of the trial as he had been since the injury. There was testimony that "this neurasthenia really incapacitates him more than his actual injury to the foot." The evidence makes a sharp issue as to the cause of this neurasthenia. The testimony offered by appellant tended to show that appellee had the syphilis, which caused the neurasthenia. For instance, appellant's evidence was that appellee was paralyzed for several months during the latter part of 1915 and early part of 1916, which showed syphilis; that all the symptoms described as neurasthenia are also the symptoms of syphilis; that these symptoms were exhibited by appellee before his injury; and, finally, that Dr. Moore made a Wassermann test of appellee's blood in July, 1917, which showed syphilis.

On the other hand, there was testimony for appellee that he never had syphilis; that his paralysis was caused by traumatism, of which he was pronounced cured by the physicians selected by appellant. In behalf of appellee there was testimony that he was strong and well when injured; that he showed no symptoms of neurasthenia until his foot was crushed; that there were no swollen glands nor bony formation along the shins, nor any syphilitic mark of any kind apparent upon him; and, finally, that two Wassermann tests, one made by Dr. Stout, at the request of appellant, the other by Dr. Hull, at the request of appellee, showed no trace of syphilis. The evidence upon this issue of fact was sufficient to sustain a finding either way, and was determined by the jury in favor of appellee.

[9] The amount of the pain and suffering, the diminished capacity to labor, the probable permanency of the suffering, and the permanency of the diminished capacity to labor, were all questions peculiarly within the province of the jury to determine from the evidence which was before them. The facts show that appellee was 27 years of age at the time of the trial; had worked as switch tender for appellant for seven consecutive years, for which he was paid $65 a month. The effi.

ciency of appellee shown by this long service for one master, and the probable reward for such efficiency usually manifested by increased compensation, as well as his life expectancy, were all alike questions for the determination of the jury.

From the testimony we cannot say as a matter of law that the amount awarded was the result of passion and prejudice. Freeman v. Harrison, 143 S. W. 686; Union Pac. Ry. Co. v. Jones, 49 Fed. 346, 1 C. C. A. 282; Griffith v. B. & O. Ry. Co. (C.C.) 44 Fed. 580.

We overrule the ninth assignment.

The judgment is affirmed.

⬤⟳For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes