ST. LOUIS & SAN FRANCISCO RAILROAD COMPANY v. W. B. MATHIS.

No. 1790. Decided February 19, 1908.

**1.—Master and Servant—Assumed Risk—Choice of Dangerous Way—Lighting Premises.**

Evidence considered in case of an engineer injured by falling into the unlighted pit of a turn-table in passing from the round house of a railway to the depot, and held that by his choice of this way, others being open to him, he assumed the risk as a matter of law, and it was error to refuse a requested instruction to find for defendant. (Pp. 343–351.)

**2.—Same—Statute.**

The injury occurring prior to the Act of April 24, 1905, disallowing the defense of assumed risk "where a person of ordinary care would have continued in the service with knowledge of the defect and danger" the doctrine of assumed risk, as distinguished from that of contributory negligence, applies. (Pp. 351, 352.)

**3.—Same—Contributory Negligence.**

A peremptory instruction to find for defendant on the ground of contributory negligence is not warranted ,where from the evidence a jury might find that the risk, though known to plaintiff. was such as a man exercising ordinary care might have taken. (Pp. 350–352.)

**4.—Evidence—Personal Injury—Exhibiting to Jury.**

It was not error, in an action for injuries involving a fracture of plaintiff's skull, to permit fragments of bone taken from the wound to be exhibited to the jury; such evidence tended to throw light on the extent of the injury. (Pp. 350, 352.)

Questions certified from the Court of Civil Appeals for the Fifth District, in an appeal from Grayson County.

*C. H. Yoakum, W. F. Evans,* and *Head, Dillard & Head,* for appellant.—Appellee based his right to recover upon the allegation that appellant was guilty of negligence in not having its turntable pit properly lighted, and the undisputed evidence shows that he (appellee) had notice of the absence of such lights before he received his injuries and he therefore assumed the risk from that condition of the premises. Missouri Pac. Ry. Co. v. Somers, 78 Texas, 441; Rogers v. Galveston City Ry. Co., 76 Texas, 502; Texas & P. Ry. Co. v. Bradford, 66 Texas, 732; 20 Am. & Eng. Ency. of Law, 124.

The undisputed evidence in this case shows that if defendant was guilty of negligence in not having the turntable pit sufficiently lighted, plaintiff was himself guilty of contributory negligence in attempting to pass the pit with knowledge of the absence of such light. Same authorities as to first proposition, especially Texas & P. Ry. Co. v. Bradford, 66 Texas, 737, and Crawford v. Houston & T. C. Ry. Co., 89 Texas, 92.

*C. B. Randell* and *J. H. Wood,* for appellee.—The evidence authorized the court to submit to the jury both the issue of contributory negligence and assumed risk, and the court would have erred had it not done so, because the facts did not warrant peremptory instructions, but were to be determined by a jury. Texas

& N. O. Ry. Co. v. Bingle, 91 Texas, 288; St. Louis & S. F. Ry.
Co. v. McClain, 80 Texas, 93; Missouri, K. & T. Ry. Co. v. Hannig,
91 Texas, 347; Galveston, H. & S. A. Ry. Co. v. Smith, 57 S.
W. Rep., 999; San Antonio & A. P. Ry. Co. v. Brooking, 51 S.
W. Rep., 539; Galveston, H. & S. A. Ry. Co. v. Henning, 39 S.
W. Rep., 304; Gulf, C. & S. F. Ry. Co. v. Knox, 61 S. W. Rep.,
970; Gulf, C. & S. F. Ry. Co. v. Gray, 63 S. W. Rep., 930.

If the appellee knew of the absence of the light prior to the
time he fell in the pit, but did not know of the danger of falling
in the pit, and the danger was not open and apparent, he would
not be precluded from recovering, because he did not assume
the danger. St. Louis & S. F. Ry. Co. v. Doyle, 25 S. W. Rep.,
461; St. Louis & S. F. Ry. Co. v. McClain, 80 Texas, 93; Missouri
P. Ry. Co. v. Lehmberg, 75 Texas, 67; Galveston, H. & S. A. Ry.
Co. v. Smith, 57 S. W. Rep., 999.

Even if appellee did discover that there was no light light-
ing up the yards surrounding the turntable pit, the evidence shows
that he discovered the same after he was out in the yards and on
his way to the passenger depot to take the train; that he was
hurrying to keep from missing the train; that it was in the nature
of an emergency; and it was a matter for the jury to determine
whether he assumed the risk or was guilty of contributory neg-
ligence in going on to the depot instead of turning back into the
round-house or taking some other course. Gulf, C. & S. F. Ry. Co.
v. Knott, 36 S. W. Rep., 491; White v. Houston & T. C. Ry. Co.,
46 S. W. Rep., 384; Jackson v. Galveston, H. & S. A. Ry. Co.,
90 Texas, 372; 5 Thompson on Negligence, sec. 5434.

The court did not err in permitting the bones taken from ap-
pellee's head to be exhibited to the jury, because the same tended
to show not only how appellee was injured, but the extent thereof
including the physical and mental suffering, all of which were issues
in the case. Hays v. Gainesville St. Ry. Co., 70 Texas, 609.

MR. CHIEF JUSTICE GAINES delivered the opinion of the court.

This is a certified question from the Court of Civil Appeals for
the Fifth District. The statement and questions are as follows:

"The appellee, W. B. Mathis, brought this suit in the District
Court of Grayson County, Texas, against the appellant to recover
damages for personal injuries received by falling in appellant's
turn-table pit at Sapulpa, Indian Territory. It is alleged, in
substance, that appellee's injuries were caused by the negligence
of appellant in this: That said turn-table pit and the appurte-
nances and appliances thereto were dangerous, and that at the time
plaintiff was injured it was very dark, and about the hour of 11:45
p. m.; that the defendant then and there failed to have and main-
tain any light or other appliances for the purpose of showing the
location of said turn-table; that the same was in the yards of the
defendant, at the town of Sapulpa, a place very much used by
defendant's servants, agents and employes in making up trains and
in moving locomotives and cars from said yards and in going from
said roundhouse to its said station in the town of Sapulpa; that

plaintiff did not know that said turn-table and the vicinity thereof, was not lighted up but that fact was well known to the defendant or by the use of ordinary care could have been known by it in time to have prevented plaintiff's injuries; that plaintiff supposed that the light was being maintained at said point for the purpose of lighting up the yards and turn-table and the vicinity thereof; and yet defendant permitted said place to remain unlighted; that the defendant then and there negligently failed and refused to notify plaintiff of the fact that there was no light to illuminate the turn-table and vicinity thereof, although it well knew the same or by the use of ordinary care could have known it, and the same was unknown to plaintiff; that by reason of all of said acts of negligence, jointly and severally, plaintiff was injured as aforesaid.

"The defense was a general denial, assumed risk and contributory negligence on the part of appellee. Appellee's injuries consisted of a broken arm and quite a serious injury to his head, necessitating the removal of a portion of his skull. A trial before a jury resulted in a verdict and judgment in favor of appellee for $11,000, and the case is now before this court on appeal.

"On September 6, 1904, and for some time prior thereto, appellee was in the employment of appellant as a locomotive engineer. At about 11:15 p. m. on the night of said date appellee was called at Sapulpa, his place of residence, to take passage upon a passenger train which was to go east at about 11:45 p. m. for the purpose of taking charge of a freight train which was then tied up at Vinita, a station some seventy-five or a hundred miles east of Sapulpa, by reason of the regular engineer on said freight train at Vinita having become sick. Appellee lived about seven blocks from the round-house of the appellant at Sapulpa, and he was directed by the caller to report at the office of the round-house foreman for the purpose of getting transportation from Sapulpa to Vinita and receiving directions as to what he was to do. The office of the foreman was in the north part of the round-house, the turn-table being on the south side of the round-house. Appellee reported to said foreman, received his transportation and directions and hurriedly left for the passenger depot of appellant at Sapulpa, which was some three or four hundred yards distant. He passed through the round-house, coming out through the south side of same and going between the turntable and what is known as the store or oil house, said turn-table and store-house being some fifteen or twenty feet apart, and fell into an excavation known as the pit of the turn-table, crushing the front part of his skull, a space of about an inch and a half by two inches, and breaking his arm. This occurred about 12 o'clock at night. Appellants round-house at Sapulpa is of the kind ordinarily used by railways. It had thirteen stalls for engines and from these stalls ran tracks to a turn-table. These tracks passed out through openings high enough to permit an engine to go out of it. The depth of the round-house from north to south on the east is eighty feet; on the west 92 feet; in the east part of the round-house are two doors; in the west part one. Situated in the northern part of the round-house is the office of the round-

house foreman who, at the time of the accident, was Joe Clough. The inner curvature of the round-house was situated toward the turn-table pit and was 54 feet from it. To this turn-table pit converged the tracks leading from the round-house so that engines going into or from the round-house might pass in upon it. The turn-table pit was 65 feet in diameter, 6 feet 4 inches in depth at the center, 3 feet and 5 inches in depth at the edges. Just within the pit and close to the circumference ran a circular steel track upon which moved the wheels attached to the end of the table. The floor of the pit was of concrete. At and on the middle of the table were two upright pieces of timber $4 \times 4$ inches. On the night in question at the time of the accident the position of the turn-table was from the northeast to the southwest. Hanging on the inside of the two pieces of timber above referred to, at about the height of a man's head were two ordinary railroad lanterns with red globes. A number of witnesses testified that these were burning at the time of the accident. No one denied this, though, some of the witnesses stated that they did not remember whether they were burning or not. These lanterns were so placed for the purpose of spotting the center of the table so as to aid in the balancing of an engine when it went upon it. They were ordinary red lanterns and did not light up the surrounding premises. East of the turn-table, 250 feet, are some coal chutes. Also east and a little north of the turn-tables, 225 feet distant, was a tool house. It was quite usual for people desiring to go from the round-house to the depot to walk between the turn-table and the store or oil room. The night of the accident was a dark one. The premises were in no way lighted up. About ten or twelve feet up on one side of the store room there was a little shed or projection. It appeared that at one time a head light had been kept on this shed for lighting up the premises, but that prior to the time of the accident it had been removed.

"Appellee Mathis testified: 'I commenced working for the defendant on the 29th day of January, 1902, working for it for a few months as fireman, first out of Springfield, Missouri, and I became a locomotive engineer for it in February, 1903. Prior to going to work for defendant I had worked for the Cotton Belt for two years and seven months as engineer. On the night of September 6, 1904, I received the injuries for which I am suing. At 11:15 that night I was called by Owen Conway, caller, to leave at 11:45 and go to Vinita to take charge of an engine there on which the engineer had become sick. He called me at my residence. I arose from my sleep and dressed and went to the round-house. The call boy waited for me on the porch until I got ready to go and we went together. He stopped at the tool house, which is about the tracks east of the turn-table and a little southeast of the round-house and I asked him to put my tool box on the engine. He stopped there to get it. The point at which Conway stopped was between 25 and 30 yards from the round-house. I went on into the round-house, entered the door at the east side and went to the office of the night foreman, Joe Clough. His duties were to mark up engineers for their runs and see that they were called and responded to the call. When I was

called I was requested by the call boy to report to the night fore-man, get my transportation and the night foreman also had to sign our trip slips before we departed. These slips were for checking us out and checking us in. I went to the round-house, asked Mr. Clough if he had my transportation fixed and he said yes, and gave me a coal book, that is, a book showing the number of pounds of coal we use on the engine, and signed my trip slips and I asked him in what direction the engine that I was to take at Vinita was going. He said, 'Never mind that. Hurry up and get to the depot and don't miss the train there, as the (freight) train is lying at Vinita until you get there for want of an engineer." That is all the conversation we had. I took my trip slip and pass, left the office and started for the depot. I came out through the round-house and down through these stalls, between these two stalls. This depot was southwest and I started southwest to it. When I left the round-house I angled a little bit from it toward the depot, going in the most practical route. Yes, there was a turn-table there and I ran into something and was thrown into the turn-table pit. I just remember running into something and fell into the pit. I then became un-conscious. This accident happened on Tuesday night between 11:30 and 11:35 and I didn't regain consciousness until the next Saturday morning at 4:20. When I regained consciousness I was then at the hospital at Springfield, Missouri.

"Q. What was the condition of the yards there, Mr. Mathis, around the turn-table in reference to light? A. There was no lights at all.

"Q. What did you say was the character of the night? A. Very dark and windy night.

"Q. Do you know whether any lights had been maintained in the yards there to light up the turn-table prior to the time you were hurt? A. Yes, sir; there had been a light kept on the east side of the oil house over the door.

"Q. Do you know what kind it was? A. Locomotive headlight. Q. Oil burner? A. Yes, sir.

"Q. Was that lit up on the night you were hurt? A. No, sir.

"Q. State whether or not it was there—you say they had a light burning there prior to that day? A. Yes, sir.

"Q. Had you been in the yards when that headlight wasn't there? A. No, sir; not that I remember.

"Q. State whether or not it lit up the yards when it was burn-ing. A. Yes, sir.

"Q. Indicated the turn-table and the surroundings there? A. Yes, sir.

"Q. Do you know how often you had seen the light burning there, Mr. Mathis? A. I had seen it a number of times; had often seen the men light it of an evening. I could see it burning lots of times, but could not tell how many times.

"Q. Were you or not able to see the pit as you passed there that night that you got hurt, the pit of the turn-table that night? "A. I didn't pass the turn-table.

"Q. I say as you went out? A. No, sir; I could not see it.

The last time I saw any light on the store-room to light up the yards was the night of June 22, 1904, before I was hurt in September. That night my wife and daughter were with me. Since that night I never had any occasion to have my attention called to that light. After my conversation with the round-house foreman, Clough, I came through the round-house and came out and started along what was the best way to get to the depot, namely, between the store-room or oil house, as it is sometimes called, and the turn-table. There is a space of fifteen or twenty feet between the turn-table and oil house. So far as I know that space was generally clear of obstructions. At the time that I was handling my engine in and out of Sapulpa I would take it from the yards east of the round-house and northeast of the coal chutes, say about 250 feet from the round-house. I was familiar with the surroundings at the round-house. I knew where the turn-table was. Had never turned an engine on it myself, but my engine was often turned on it and I had often seen them turn engines on it. I had been familiar with this yard and turn-table since I had been working in Sapulpa. On the particular night on which I got hurt the yards were not lighted up. The last time I remember noticing them lighted up was the 22d of June, 1904, and the other nights that I had been there subsequent to the 22d of June I hadn't noticed whether they were lighted up or not; never had my attention called to it. I don't know how long the light had been discontinued, but I did see it on the 22d of June, 1904. My attention was called to it on that night, but not on any subsequent night and for three, four or five months longer prior to the 22d of June, 1904, except on that particular night of the 22d of June my attention had not been called to the light.

"Q. Then it might have been discontinued as a regular thing for several months and you not notice it? A. I never had occasion to have my attention called to that one way or the other.

"On the night in question, after leaving my home, I reached the railroad track east of the tool house, crossed northward over the tracks and main line, came westward, stopped at the tool house and then went on westward until I got to the round-house, went in at the eastern door and then went into Clough's office, came through the round-house, left it between the sixth and seventh tracks, started to angle across so as to pass between the turn-table and the store-room. On this particular night there was no light on the store-room so when I came out into the yards it was dark all around me. I was not keeping a lookout for the turn-table any more than anything else. I was in a hurry. I had not particularly forgotten about the turn-table pit. I had a short time to get to the depot and I was trying to get there the best way I could over the short route that we had to go down there. I wasn't thinking about the turn-table any more than anything else. I supposed the way was clear as it usually was, and didn't look for the turn-table or pit or anything else. Didn't have time to look for any particular thing. It was so dark if I had looked for the turn-table pit I would not have seen it. There was no light. I recognized there was

no light there and went right ahead." Appellee's wife testified that she saw a light on the store, or oil house, on the night of June 22, 1904, and several times prior to that date. His daughter testified that she saw the light there in the month of June, 1904.

"Owen Conway testified: 'I worked for the defendant at Sapulpa from May, 1904, to January, 1905, as caller for engine men. I was working at night and was familiar with the yards. I knew all about the yards and their condition while I worked there. The usual way in going from defendant's round-house to the depot would be right by the turn-table. The night plaintiff was injured was a dark, cloudy night, still and quiet. The yards in the vicinity of the turn-table were used in running engines in and out of the round-house, both day and night. The yards on the night of September 5 were not lighted. There was no light in the vicinity of the turn-table at that time and had not been during the time I worked there prior to September 6. There had been none there during the time I had been working for defendant since May. I saw the plaintiff on the night that he was injured as they lifted him out of the turn-table on the north side. The tool or supply house was almost due west from the turn-table. I called plaintiff at 10:20 p. m. to leave at 11:20 p. m. I went with plaintiff from his residence to the round-house that night. We left his residence about 10:45, went west two blocks, then north six blocks to the round-house. After we got to the round-house plaintiff told the foreman to give him a pass, that he was in a hurry. The foreman gave plaintiff a pass, he picked up his grip and walked out. I never heard any other conversation. I saw him leave the foreman's office and then saw nothing more of him until they were lifting him out of the turn-table pit.'

"James Beck testified: 'I am familiar with the round-house, turn-table and railway of defendant at the town of Sapulpa. I began work in January, 1901, as coal heaver at the coal chutes; worked as coal heaver about two and a half months, then went from the chutes to the cinder pit, shoveling cinders. I worked at the cinder pit until May, 1901. From there I was transferred to the round-house as engine wiper and worked in various positions until October, 1903, when I was made electrician's assistant, and afterwards, in the early part of 1904, I was promoted to the position of electrician. My duties as electrician at Sapulpa were to inspect, clean, repair and test headlights, both electric and oil headlights, coming into and going out of the round-house at Sapulpa, including the lights used for lighting the round-house and yards, except those about the passenger depot at Sapulpa. The most direct and practical route from the round-house would be between the turn-table and store room. I do not know whether the yard was lighted on the night of September 6, as I was not there, but I do know that defendant had maintained a light for the purpose of lighting the yards. There had been kept an oil headlight sitting on a little shed just over the east door of the store room. This light was there when I went to work for the defendant and was kept there until within two or three weeks before the night

of Septemebr 6, 1904. It was then discontinued. I had removed it and placed it on an engine under the direction of Mr. J. T. Jones, the division superintendent, as there was no other light to go on the engine.'

"Joe Clough testified: 'I was night round-house foreman for defendant at Sapulpa in September, 1904. I went to work for defendant about the middle of June, 1903, but did not become foreman until the 5th of August, 1903. At one time a headlight was maintained on the shed projection from the store room for the purpose of lighting up the yards. I do not remember just when it was removed, but I know it had not been maintained for a year. I was in my office in the round-house at the time of the accident to plaintiff. He came in there and then went out to take a train and go to Sapulpa and take charge of an engine there. I do not know exactly how much time he had to catch his train, before he left for Sapulpa, but I know he had ample time. I do not remember any special conversation which occurred between him and me.'

"J. T. Jones testified: 'That he went to work for defendant in July, 1903, and quit working for it in December, 1904. That he worked for it at Sapulpa and became general foreman or superintendent for it there about August, 1904. He stated that no light was maintained for lighting up the yards during his time there, and he stated that he did not direct Mr. Beck in August, 1904, to take a headlight down from over the store room and place it on an engine. That there was no light maintained there during that time.'

"Ed Yocum testified that the last time he went to work for defendant it was in August, 1904, and that there was no light maintained there at that time to light up the yards. That at one time about a year or so before that time there had been a light there and it was his duty to light the light, but that it had been discontinued and was not there when he returned to work in August, 1904.

"George Vance testified: 'On the night of September 6, 1904, the yards in the vicinity of the turn-table were not lighted up. There was no light except two red lights hung in center of the turn-table and these lights did not light up the yards in the vicinity of the turn-table. One could not distinguish the edge of the turn-table pit from the red lights. If they had ever maintained a light for the purpose of lighting up the turn-table and the yards in that vicinity, prior to September 6, 1904, I don't know when it was discontinued.'

"J. O. Gamel testified: 'There was no light there except the red lights on the turn-table. There were two of them burning that night. There were never any lights there that I saw.'

"H. A. Allen said: 'There had been such a light. It was placed over the door to the store (or oil) room. It had been as much as six months and probably longer since said light had been maintained there.' It was shown that appellee was in Sapulpa with his engine at various times from and including July 3, 1904, up

to and including September 4, 1904. The trial court submitted the issues of assumed risk and contributory negligence on the part of appellee to the jury for their determination. The appellant insists 'that the undisputed evidence shows that appellee both had and was charged with notice of the unlighted condition of the turn-table pit, prior to the receipt of his injuries,' and assumed the risk of such unlighted condition; that the undisputed evidence shows that appellee was injured through his own negligence, and therefore, the court erred in refusing to peremptorily instruct the jury, as requested, to return a verdict for appellant.

"The trial court also permitted appellee, over the objections of appellant to introduce in evidence and exhibit to the jury about twenty pieces or fragments of bones, from about the size of a finger nail to the size of a quarter of a silver dollar, which were taken from appellee's head as a result of his wounds. The objection urged was that such evidence and exhibition were irrelevant and were calculated to draw the minds of the jury from the true issues and prejudice them against the defendant. This ruling of the court is assigned as error.

"The members of this court differ as to the correctness of the trial court's action upon these matters, and deem it advisable to certify the questions set out below to the honorable Supreme Court of Texas for decision. The specific questions are:

"First. Under the facts and testimony of the witnesses stated, was the trial court authorized to charge the jury as a matter of law, that appellee knew or must necessarily have known, in attempting to perform the service required of him by appellant, that the turn-table pit into which he fell, and the yards in its immediate vicinity, were unlighted and dark before he received his injuries and therefore he assumed the risk from that condition of the premises?

"Second. Was the trial court authorized to charge the jury as a matter of law, that appellee was guilty of contributory negligence and hence could not recover?

"Third. Did the trial court err in refusing to give appellant's requested instruction, directing the jury to return a verdict for the appellant?

"Fourth. Did the trial court commit reversible error in permitting appellee, over the objection of appellant, to introduce in evidence and exhibit to the jury the fragments of bones which were taken from his head?"

As to whether there was another way by which to reach the station from the office the evidence is somewhat vague. But it appears from the certificate that the plaintiff testified as follows: "I came through the round-house and started along what was the best way to get to the depot, namely, between the store-room, or oil house, as it is sometimes called, and the turn-table." Conway testified: "The usual way in going from defendant's round-house to the depot would be right by the turn-table." Beck also testified that: "The most direct and practicable route from the round-house would be between the turn-table and the store-room." From

the testimony quoted we think it is to be inferred, that there was another or other ways by which the station could have been reached by a person going thereto.

Mr. Labatt, an author who can not be accused of partiality towards the master, lays down the law as follows: "The class of cases referred to is that in which recovery is denied on the broad ground that the servant himself deliberately selected the course of action which led to his receiving the injury complained of. Under such circumstances, he must obviously be regarded as having taken upon himself the responsibility for any personal harm which he may suffer as a proximate result of the selection thus made. In these, as in most other cases where the intentional adoption of a certain line of action is proved, the facts will also be suggestive of contributory negligence. But it is both unnecessary and disadvantageous to rely upon a conception which raises a disputable question, if a decisive element is supplied by the clear evidence of a deliberate choice on the servant's part, or the exercise of his own judgment in creating the conditions which occasioned the accident." (1 Labatt's Master and Servant, sec. 258.) Numerous cases are cited in illustration and support of the doctrine and among them is that of the International & Great Northern R. R. Co. v. McCarthy (64 Texas, 632). In that case McCarthy, a road-master, was furnished by his superior with a velocipede hand-car, which he was to use upon the road at his option. In using the machine he was run over by a train and killed. His widow brought the action for the injuries resulting to her from his death, and alleged among other things, that the machine was dangerous and that the death of decedent was caused by reason of its defects. It was held that since the use of the velocipede was optional with him, when he elected to use it, he assumed the risk of any injury resulting from its defective construction.

In this case the plaintiff was not even directed by the foreman to go the route that he took; though it would seem from the decision in Texas & Pacific Ry. Co. v. Bradford (66 Texas, 732), it would have made no difference. For in that case the plaintiff was directed to straighten the rails, by his superior officer without the use of the proper tools, and it was held he could not recover because he assumed the risk. Here the plaintiff, although there was another way he might have taken not shown to be dangerous, chose the one fraught with danger as the evidence discloses, although it does not appear that there was any necessity or urgency for his doing so.

Under the circumstances, we think that he assumed the risk and consequently answer the first question in the affirmative.

As pointed out in the case of Texas & Pacific Ry. Co. v. Bradford, cited above, between the doctrine of assumed risk and contributory negligence as applicable to such case, in contributory negligence the question usually arises, what would a prudent man have done under the circumstances? If a prudent man under the exigencies of the case, would have taken the chances and acted as plaintiff acted, he is acquitted of negligence. If he assumes

the risk the question of contributory negligence does not arise, for by his assumption of the risk he absolutely precludes himself from a recovery for any injury that may result to him from such risk. Our Legislature had this distinction in mind, when they passed the act approved April 24, 1905, which practically abolishes the distinction. Section 1 of that act provides, in effect, that assumed risk shall not preclude a recovery, in · case "Where a person of ordinary care would have continued in the service with the knowledge of the defect · and danger and in such case it shall not be necessary that the servant or employe give notice of the defect as provided in subdivision 1 hereof." (Laws 1905, p. 386.) It was held in Gulf, Colorado & Santa Fe Ry. Co. v. Gasscamp (69 Texas, 545),· that it was a question for the jury, whether a plaintiff who knew of the defects on a bridge and crossed it and was injured was guilty of contributory negligence although there was another safe way he may have gone and thus avoided the injury. A judgment in favor of the plaintiff in that case was affirmed. We therefore answer the second question in the negative.

It follows that the third question should be answered in the affirmative.

We think the fourth question should be answered in the negative. In Missouri, K. & T. Ry. Co. v. Moody (35 Texas Civ. App., 46), it was held that it was not error to admit similar evidence, and a writ of error was refused by this court. A like ruling was made in Texas Midland Ry. Co. v. Brown (58 S. W. Rep., 44), and Missouri, K. & T. Ry. Co. v. Lynch (90 S. W., 513), in which also writs of error were refused. The evidence tended to throw light upon the force of the concussion and the extent of the injuries. See also (17 Cyc., 295)