THORNHILL v. KANSAS CITY, M. & O. RY. CO. OF TEXAS. (No. 6175.)

(Court of Civil Appeals of Texas. Austin. March 24, 1920. Additional Opinion May 19, 1920.)

1. Master and servant ⏦288(16½)—Assumption of risk from inadequate force held question for jury.

In an action by a railroad machinist's helper for negligence in failing to provide an adequate force of men for handling parts of a locomotive, evidence *held* sufficient to warrant submission of the issue of assumed risk to the jury.

2. Trial ⏦253(4)—Charge on assumption of risk by railroad employé held erroneous as ignoring statutory element of foreman's knowledge.

In an action by a railroad machinist's helper for negligence in failing to provide an adequate force of men for the work, defended on the ground of assumed risk, it was reversible error to give a charge ignoring the elements of Rev. St. 1911, art. 6645, that the defense of assumed risk could not be available where plaintiff's foreman knew of the defect or danger prior to the injury.

3. Master and servant ⏦291(12)—Charge on burden of proving assumed risk held erroneously refused.

The burden of proof as to the defense of assumed risk was on the employer, and it is error to refuse a request to so charge.

Additional Opinion.

4. Master and servant ⏦287(1)—Negligence in furnishing insufficient help held question for jury.

In an action for injury to a railroad employé, evidence as to defendant's negligence in not furnishing sufficient help for the work *held* sufficient to take such issue to the jury.

5. Appeal and error ⏦882(15)—Writing of incorrect charge held not invited error, in view of subsequent request.

Where appellant's counsel, at the court's request, wrote a portion of the charge given, and subsequently requested the court to give a special charge supplying an erroneous omission, which was refused, *held*, that appellant did not invite the court to commit the error.

Appeal from District Court, Tom Green County; C. E. Dubois, Judge.

Suit by J. W. Thornhill against the Kansas City, Mexico & Orient Railway Company of Texas. Judgment for defendant, and plaintiff appeals. Reversed and remanded.

Blanks, Collins & Jackson, of San Angelo, for appellant.

H. S. Garrett, of San Angelo, for appellee.

BRADY, J. Appellant sued the appellee, railway company, for damages for personal injuries. He alleged that at the time of the injuries he was in the employ of appellee as machinist's helper, and in the course of his duties was called upon to assist in repairing a locomotive engine, which required the handling and lifting of the heavy main and side rods from the engine, and that the appellee had negligently failed to provide a reasonably adequate force of men to perform that work, but that he and the machinist were compelled to do the same without help or assistance. Appellee answered by general denial, and specially pleaded assumed risk and contributory negligence.

The court submitted the case upon special issues, in response to which the jury found that the railway company was negligent in failing to furnish an adequate force of men, but that the appellant was guilty of contributory negligence and also of assumed risk, and that, after allowing for his own negligence, appellant was damaged in the sum of $400. The evidence upon these issues is conflicting, there being testimony on the part of appellant and his witnesses that the work in question required the services of from four to six men, the rods being very heavy, and that two men were a wholly inadequate force. On the other hand, there was testimony that, although several men were usually and ordinarily employed for such work, it was frequently done with only two men, and that it could be done by two men with reasonable safety to themselves. The machinist and the appellant were doing this work at night, and it seems undisputed that the fact that it was being done by only two men was known to the foremen, who were their superiors and charged with the duty of providing assistance, if it were required. Judgment was rendered by the trial court for appellee, upon the verdict of the jury. There are no briefs on file for appellee.

[1] The first two assignments of error raise the point that the court should not have submitted the issue of assumed risk, which was seasonably objected to, and that the court should have granted the motion to set aside the verdict of the jury, because under the undisputed testimony the defense of assumed risk was not available to appellee. In view of the testimony of the witnesses Ringler, Bennett, and White, we cannot agree that the undisputed evidence shows that the foremen knew the work was being done by an insufficient and inadequate force. It may be conceded that they knew that only the machinist and appellant were doing this work, but it does not follow, in view of the testimony, that they knew such was an inadequate force. Therefore these assignments are overruled.

[2] The third assignment of error complains of the action of the trial court in re-

---

·fusing to submit to the jury appellant's requested special charge No. 3, which was as follows:

"Even though you shall find from the evidence in this case that the plaintiff knew that two men was an insufficient force with which to do the work in which he was engaged at the time he claims to have been injured, and appreciated the danger incident to· doing such work with such insufficient force, yet you are instructed that he did not assume the risk of injury from doing the work with such insufficient force, if you find and believe from the evidence that the superior officer of the defendant, intrusted with the duty of providing an adequate force of men for such work, knew that the same was being done by an inadequate force, and if you find from the evidence that such superior officer knew of such insufficient force, then, in that event, you will answer special issue No. 4, 'No.'"

In charging the jury upon the issue of assumed risk, the court gave this explanatory charge:

"In determining your answer to this question, you are instructed that the plaintiff assumed the risk of the injury which he suffered if he knew that he was working with an insufficient force of men, and knew, or must necessarily have ascertained in the course of his duties, the danger incident to such work with such insufficient force, and an ordinarily prudent man would not have continued in the work he was then doing with knowledge of such insufficient force and the danger thereof. If you find from the evidence either (a) that the plaintiff did not know, or must not necessarily have ascertained in the course of his duties, the danger incident to· doing the work in which he was engaged with two men, or (b) even if he knew of the insufficient force and the danger, that a person .of ordinary care would have continued in the work he was then doing, then you will answer the foregoing question, 'No.'".

Article 6645, Revised Statutes, provides that in an action by an injured employé, where the ground of the plea is knowledge or means of knowledge of the defect and danger causing the injuries, the defense of assumed risk shall not be available to a railway company in the following cases: (a) Where the employé had informed his superior, intrusted with authority to remedy or cause to be remedied the defect; or (b) where such superior already knew of the defect; or (c) where an ordinarily prudent person would not continue in the service with the knowledge of the defect and danger; and in such case it is not necessary that ·the employé give notice of the defect. This statute has been held applicable in a case with similar facts. Railway Co. v. Shelton (Com. App.) 208 S. W. 915.

The main charge of the court ignored an important element of the statute, namely, the case where the superior of the employé already knew of the defect and danger; and, as the issue was submitted, appellant was deprived of the benefit of this provision of the statute. The court in effect charged the jury that if the appellant did not know of the danger incident to doing the work with only one helper, or if he knew of the insufficient force and danger, yet, if a person of ordinary care would have continued in the work, the question should be answered, "No," and the defense of assumed risk would be unavailable to appellee.

The jury was not charged, as expressly provided by the statute, that the defense would not be available to appellee if appellant's superior already knew of the defect, independently of whether a reasonably prudent person would have continued in the work. This seems to us to be the plain meaning of the statute, and, as the special charge requested presented this phase of the law, it was reversible error for the trial court to refuse to give it. As submitted to the jury, the doctrine of assumed risk was too restricted, in view of the terms of our statute, and the appellant was deprived of a substantial right, which necessitates the reversal of this case.

[3] Appellant also complains at the refusal of the trial court to charge the jury that the burden of proof was on the appellee to establish its defense of assumed risk by a preponderance of the evidence. Following the submission of the issue of assumed risk, the court charged the jury that the burden of proof was upon the plaintiff to make out his case by a preponderance of the evidence, and refused a charge requested by appellant that the burden of proof was upon the appellee as to assumed risk. We think the burden on this issue was upon appellee, and that the court should have so instructed the jury. Railway Co. v. Scott, 160 S. W. 432; Railway Co. v. Parks, 97 Tex. 134, 76 S. W. 740; Railway Co. v. Shieder, 88 Tex. 152, 30 S. W. 902, 28 L. R. A. 538; Railway Co. v. Kendall, 78 S. W. 1081; Railway Co. v. Houston, 185 S. W. 919. For this reason also the case will be reversed.

In view of the probability of another trial of this case, although it is not necessary to decide the question, especially in the state of the record, we think it proper to suggest the query whether, in a case with such facts as here appear, the defense of contributory negligence would be available at all, where the issue of assumed risk is submitted, and there is a finding that the employé did not assume the risk. This question is suggested because of the statement in the opinion of the Supreme Court in Railway v. Mathis, 101 Tex. 342, 107 S. W. at page 535, and by the Court of Civil Appeals for the first district, in Rice v. Lewis, 59 Tex. Civ. App. 273, 125 S. W. 961, to the effect that the Legislature has practically abolished the distinction between assumed risk and contributory negli-

gence by the enactment of the assumed risk statute. The language of Judge Gaines in the Mathis Case was as follows:

"As pointed out in the case of Tex. & Pac. Ry. Co. v. Bradford, cited above, between the doctrine of assumed risk and contributory negligence as applicable to such case, in contributory negligence the question usually arises: What would a prudent man have done under the circumstances? If a prudent man under the exigences of the case would have taken the chances and acted as plaintiff acted, he is acquitted of negligence. If he assumes the risk, the question of contributory negligence does not arise, for by his assumption of the risk he absolutely precludes himself from a recovery for any injury that may result to him from such risk. Our Legislature had this distinction in mind when they passed the act approved April 24, 1905, which practically abolishes the distinction. Section 1 of that act provides, in effect, that assumed risk shall not preclude a recovery, and that 'where a person of ordinary care would have continued in the service with the knowledge of the defect and danger, and in such case it shall not be necessary that the servant or employé give notice of the defect as provided in subdivision 1 hereof.' Laws 1905, p. 386, c. 163."

If the very facts relied upon to constitute assumed risk are also the precise facts claimed to establish contributory negligence, as appears to be the case here, it would seem anomalous to leave available to the defendant the defense of contributory negligence, if there should be a finding against assumed risk. The conclusion that the employé is not chargeable with assumed risk would seem necessarily to require the holding that he is not guilty of contributory negligence, when precisely the same facts are relied upon to constitute the two defenses. There may be circumstances in which the conclusion suggested would not be applicable, but in circumstances such as appear in the instant case we are inclined to think that the suggestion of the Supreme Court in Railway Co. v. Mathis is applicable. As stated, however, we do not think it necessary, or even proper, to decide the question.

For the errors indicated, the cause will be reversed and remanded.

Reversed and remanded.

### Additional Opinion.

KEY, C. J. On the 24th day of March, 1920, this court decided this case, and reversed and remanded the judgment of the trial court, because of the failure of that court to give an instruction requested by appellant, and relating to the question of discovered peril. In the opinion then filed by this court it was stated that no briefs were on file for appellee, and that statement was correct. But it having been made to appear that counsel for appellee had in fact prepared and delivered to the clerk of this court briefs for appellee, upon our own motion, the judgment of this court was set aside, and the cause reset for submission. Other copies of appellee's brief were filed, and the case was submitted upon briefs of both parties and oral and written argument for appellee.

[4] The main, though not the only, contention presented on behalf of appellee is that the plaintiff not only failed to prove that the defendant was guilty of the negligence charged against it, but that the undisputed testimony clearly shows that it was not guilty of such negligence, and therefore the judgment in its favor should be affirmed, regardless of errors which may have been committed by the trial court. The cause of action relied on in the plaintiff's petition was the alleged negligence of the defendant in failing to furnish sufficient help to do the work, the performance of which by the plaintiff with the assistance of only one other man resulted, according to the plaintiff's claim, in the injury for which he sought to recover damages. We have carefully read and re-read the statement of facts, and have reached the conclusion that there was testimony which entitled the plaintiff to have that issue submitted to the jury.

Counsel for appellee contends that the undisputed proof shows that, in the performance of the work in which he was engaged, appellant was not required to lift over 40 pounds, and that as appellee had no notice of the fact that he had previously sustained an injury, which may have rendered him unable to lift that much without being injured, it was not negligence on the part of appellee to expect and require him to lift that much weight on the occasion in question. If it was clear that the undisputed proof showed that state of facts, we might concur in that contention, but, in our judgment, such is not the case. The plaintiff testified as follows:

"I was working at the Kansas City, Mexico & Orient Railway Company of Texas' shops, in San Angelo, on April 7, 1916, as a machinist's helper. The damages sustained by me and for which I have filed suit against the Kansas City, Mexico & Orient Railway Company of Texas were sustained by me in the nighttime. I worked for this company at their shops in San Angelo during the day before this injury occurred, and quit work about 4 o'clock in the afternoon, or after I had put in eight hours' work that day, and went back on duty that night at the same place. We quit work in the afternoon and went home, and I think we were off an hour, maybe two hours; but we got supper and came back to work. I was told by the machinist that afternoon to come back that night. I wouldn't be sure whether the day foreman told me to come back. I was working under Mr. Chapman—he was directing the work I was doing. As to Mr. Chapman's initials, I am not certain, but think it has an H. in it. I was working under Mr. Chapman during the afternoon, and he told me to come back that night, and he is the same Chapman under whom I worked that day, and also that night.

"Mr. Chapman and I were engaged in dismantling an engine that night—taking off the old brasses and putting on new ones—but we had plenty of help in the daytime. Mr. Chapman directed that work. When I came back on duty that night no other helper was there; just Mr. Chapman and I finished that job. By 'dismantling an engine,' I mean that we took the side rods and main rod · off the engine. These rods go from one drive wheel to the other, and the main rods are, I think, approximately 10 feet long and the side rods are shorter; there are three of them. I never weighed one of those rods and don't know how much they weigh. In my judgment, the main rod on that engine would weigh over 500 pounds, and the smaller side rods would weigh 150 pounds; the side rods will weigh from 150 pounds to 350 pounds, I think. This was a 200 class engine we were working on. We handled those rods that night by main strength and awkwardness. We had a small block and tackle, but it got away from us. Mr. Chapman directed the way those rods were to be handled. I had handled rods before on that class engine and was acquainted with the number of men usually and ordinarily used in handling that work on that class of engine in the Orient shops, and for this class of engine there were ordinarily used six or eight men for the main rods and three to four for the side rods, taking them off the pins and putting them back on.

"When I first reported for duty on the night I was injured Mr. Chapman said, 'Dad, we have got to put her up; we have got to have more help; I will step around and see if I can get any;' and he was gone awhile and came back and said, 'I can't get any, and we will have to put her up.' I guess he was gone 15 or 20 minutes, but don't know the exact time. After Mr. Chapman came back, he and I put the rods up. We had dismantled the engine during that day and put up one rod, and we were putting the others up that night. I don't know which rod we put up first, but believe we put the main rod up first and then the side rods; that is my recollection. We used no block and tackle in putting up the side rods; we did the main rod. Mr. Chapman directed how the rods were to be put up. Mr. Chapman and I ate a lunch at about 12 o'clock that night. We had not finished our work when we ate our lunch; we worked all night that night.

"In putting up these rods that night I was injured. I suffered pain from this injury. I was suffering in my stomach like I had the colic. I discovered this hurting just before Mr. Chapman and I had our lunch that night. I was hurting all over and more in my stomach, like I had cramp colic; I didn't know what was the matter, only that I was weak and hurting. I continued to work the rest of that night, and worked next day, after being called back to work. I think it is half a mile from the Orient shops to where I lived. The next day after I was injured I tried to get a physician, but didn't get him, but the day after that I got Dr. Nibling; I came to see Dr. Nibling at his office. I was ruptured. I first discovered that I was ruptured when I went to take a bath that afternoon after I was hurt that night before. I took a bath after quitting work that day, at 4 o'clock, after I had done my day's work, and I was at home, in a bathtub, when discovered that I was ruptured.

"The side rods are connecting rods and there is a main rod; we put them all up. There are different kinds of rods on different engines; the 200 class is different from the 500 class. There is a main rod on each side. We put four up; we called them side rods; we did not call them all side rods; there is a main rod on each side. It is my estimate that the main rod weighed over 500 pounds and the side rods 150 to 350 pounds; I never saw one weighed; I think the main rod weighs over 500 pounds and the other from 150 to 350 pounds. That is the estimate I made from handling them—from 150 to 350 pounds. I think the main rod is over 500 pounds. I have not handled any rods since the night I got hurt; I had handled rods before. It is not a very common sight for dismantling engines and taking off the main and side rods with two men; however, it was common to dismantle an engine that way; every time we repaired an engine we had to do it—take the rods down and put them back. I had seen that done many times and helped to do it. I said Chapman said something about he would have to have more help.

"Q. You knew, then, that two men were not enough to lift that, didn't you? A. I knew it wasn't enough to lift the main rod; I said, 'Chapman, two of us are not enough to handle this big rod.'

"Q. You knew at the time they were too heavy for two men to handle? For you knew the weight? A. I was guessing at them; yes, sir.

"Q. So you knew if you two men attempted to handle them there, they were liable to get away from you? A. No, sir; they will not get away from us.

"Q. You knew they were too heavy for two men to handle? A. I did; yes, sir; and you do too, and any of these jurors will know it if they will go look at them and take hold of them.

"Q. Yes, sir; so you knew they were too heavy? A. Yes, sir; they were too heavy."

Charles Blanton, a witness for the plaintiff, testified that he was a machinist, and had worked for railway companies, including the Orient and the Katy; that he had helped dismantle a number of engines; that he was familiar with the 200 class engine used by the Orient in 1916; that it was a very heavy engine, and its main rods were very large, but he did not know how much they would weigh, nor did he know the weight of the smaller or side rods; that he had had experience in handling both class of rods on the Orient's No. 200 class engines, and that from six to eight men were used in handling the main rods and from four to six in handling the side rods; and that that number of men was required to handle the rods referred to.

The defendant read in evidence the deposition of C. W. Chapman, who testified:

"I am foreman of the International Marine & Iron Works. The nature of my work is supervising the construction of hoisting engines, propellers, wrenches, capstans, and other kinds of iron work for the United States government. I was employed by the Orient Railroad as a

machinist in the shops at San Angelo, Tex., during the month of April, 1916. I know J. W. Thornhill. He was working with me on or about April 7, 1916. Thornhill was working at the Orient roundhouse at San Angelo, Tex. He had been working at the roundhouse for two years that I know of while I was there. Mr. Thornhill was a machinist helper. A machinist helper works with a machinist and acts as his assistant, and when not working at this he cleans up around. Thornhill had assisted me in dismantling engines in the shop at San Angelo. He had assisted me in dismantling or repairing engines of the 200 class. The said Thornhill and I were working together on or about April 7, 1916, at the Orient roundhouse at San Angelo, Tex. We were doing repairs on side rods and main rods on an engine; that is, we were repairing an engine of the 200 class. He was helping to lift the rod off and on and also helped push the brass in with a hydraulic jack. We then put the rods on a truck and hauled them over to the engine. While Thornhill and I were engaged in placing some appliances on an engine in the roundhouse on or about April 7, 1916, I believe that I do remember his saying that he had hurt himself, but he did not say where he was hurt or how badly he was hurt at that time. We were lifting the rod from the truck on the pins when Thornhill claimed to have been hurt. Just the two of us were engaged in the work at that time.

"Thornhill and I had done such work as this before April 7, 1916. I know that he worked with others on the same kind of work, but do not know whether he worked on such jobs with only one man or not. When Thornhill and I, or two other persons, were doing this work, it all depended on whether they were in a hurry for the engine or not as to how we usually put the appliance up or got it up or fastened it on the engine; if there was no hurry, we would put blocks under the ends and lift one end at a time. If we were in a hurry for the engine, the two men would just lift the rod and put it in position and finish the repairs. Thornhill and I had done such work before on such an engine in the same manner that we did the work on this occasion. When we started to do this work, I believe Thornhill said we ought to have some more help to do the work. In case of emergency this work was done by two persons. The rod was usually lifted up and put in position when two men were working on the job. It was customary for two men to do this work when additional men were not available. We would not use blocks when we were in a hurry. When we started to do the work on this occasion Thornhill just said we ought to have some help to do the work. I told Thornhill to see if he could get some men to help do the work. He told me the men were all busy. I told him we would have to put it up ourselves. I do not remember telling him that he could do the work without injuring himself. I do not remember ever telling Thornhill that. I did not anticipate that Thornhill would be injured. Thornhill and I just took hold of the rod and lifted it right up in position. Just us two placed the appliance on the engine. Thornhill did not refuse to do the work. I did not use any force to make him do the work. I just asked him if he was man enough to do the job, but I do not remember what he said

in reply. He went ahead and did the work with me. He was grumbling about not having another man to help put up the appliance. After he returned and made his report to me and I had said to him what I have stated, Thornhill made no protest against going ahead and assisting me in doing the work, more than just complaining because we did not have more help. I did not threaten him in any way. I was friendly to Thornhill. I do not remember Thornhill's saying anything after the work was done. We could see the appliance before we put it up. Thornhill was in a position where he could see it. It was at night. We had a light by which we could see the appliance. The appliance was not hidden from Thornhill. There was nothing to prevent his seeing the appliance.

"At the time Thornhill and I were working together putting up the appliances on the locomotive I was neither boss nor foreman at the roundhouse. I was employed as a machinist. I did not have authority at such time to go and order or to require other employés to come to the assistance of Mr. Thornhill and myself in putting up the appliances. I had no authority at all to order men to come and help me do work. I was not the boss of the other employés in this respect. I did not have authority to give such other employés any such orders. I did not ask or request any additional employés to assist Mr. Thornhill and myself in working on the engine or in putting up the appliances, nor call for any such additional employés more than that I asked Mr. Thornhill to see if he could get more men to help do the work.

"I sent Thornhill for help is the only call that I made for special help in doing this work on the engine, mentioned in my answers to my direct interrogatories. It is not true that when no other hands could be found that I told Thornhill that he would have to come on and assist in the work without any other help. I did not make any remark in this way, but did say something like this, 'Dad, it is up to you and me to do the work.' It generally takes from three to five men to do the work in which Thornhill and I were engaged at the time he claims to have been injured, when they are available. However, two men can do the work in an emergency. It was not usual and customary for two men to do the work that Thornhill and I were doing at the time, but, as stated, in an emergency two men did the work. I do not remember telling Thornhill since he was injured that we did not have sufficient men to do this work. Thornhill claimed to me at the time that we ought to have some more men to do the work. I do not remember that Thornhill said we could not do this work by ourselves. I told Thornhill that I thought it was up to us to do the job, but did not use any force or threats to him to get him to help me do the job. I have already explained that the only thing I did was to tell him it was up to us to do the work, which we both did at that time. In doing this work it does not become necessary for one person to lift the main or side rods, but it does sometimes become necessary for two persons to lift them. In doing this work it does not become necessary to lift these rods if you use blocks; it is not necessary then to raise the rods by hand. It is usual

for more than two men to lift the rods when they are picked up all at once, but two men can lift the rod if they are good men."

F. A. White, a witness for the defendant, testified:

"I live at Hamlin. I was living in San Angelo, April, 1916. At that time I was night foreman at the roundhouse of the Kansas City, Mexico & Orient Railway Company of Texas, at San Angelo. I am employed as roundhouse foreman for the Kansas City, Mexico & Orient Railway Company now, at Hamlin. As night foreman at San Angelo, I came on duty at 7 o'clock p. m. and went off duty at 7 o'clock a. m. As night foreman, I was the man who had authority to direct the men and give them orders as to what particular work they should do, and no one else had such authority.

"I never saw Mr. J. W. Thornhill but two or three times till this morning. He worked in the daytime and I at night. I wasn't personally acquainted with him. Some time after the injury occurred, or which is claimed by Mr. Thornhill occurred by his lifting side rods to a locomotive and strained himself, causing rupture, I heard of it. Neither Mr. Thornhill nor Mr. Chapman came to me on the night of April 7, 1916, the night this injury is supposed to have occurred, and requested the assistance of more men in putting up the side rods on a 200 class engine. Nobody else around there besides me had any authority to direct anybody to go help them. I was the only man who had authority to make any such orders. I did not see the alleged injury at the time it is alleged to have occurred. I didn't know there was any trouble till several days afterwards I heard some of them speak about it.

"It is my duty to look after the entire working force at the roundhouse; I was night foreman at that time. It was my duty to direct certain work—to direct certain men to do certain work and to direct men to do other work. They were all under my directions. I had charge of everything at night, and saw to the assignment of each man to do this or to do that. I didn't assign Thornhill and Chapman to do this work on that night; Mr. Ringler, the general foreman, had those fellows called back. Of course, if they had to have assistance, it was my duty to see to that. Mr. Ringler was general foreman, and he had Thornhill and Chapman come back and do this work. But they were under my jurisdiction while working. The work that is done is done under my direction. I am responsible for everything done at night. I would have had something to do with that work that night, if Thornhill and Chapman had come around and wanted any assistance, like a machinist. I can have a machinist place a side rod or pack a piston, but I have nothing to do with it till he asks me; I don't pay him any mind. After the machinist is directed to do the work, he takes the helper and goes and does the work, and while he is doing that work he has control of the helper. The helper does what the machinist tells him to do; that is our system over there.

"I do not know who was on duty at the roundhouse on the night of April 8th, whether there was any special work being done there then or not. It was some time afterward that I heard of this Thornhill accident. I do not know whether anybody the night after that,

April 8th, came to me and wanted help. They frequently come to me over there for me to give them a hand or something. I don't know when that was; I didn't put it on the books. If a man wanted anything. I gave him help to help him. I knew Thornhill and Chapman were back there doing that work that night. I couldn't help but seeing them. They were there. Everybody in that shop at night is under my control, but Mr. Ringler, in the afternoon, lined Mr. Chapman and Mr. Thornhill up and told them to come back and do the work, and they were under my control that night. I saw what they were doing and I saw the irons they were putting on. I knew there were only two men there doing that work."

J. D. Bennett, a witness for the defendant, testified that he had been in defendant's employment for about nine years as a machinist; that he was familiar with all the rods on a 200 class engine, such as was used by the defendant in April, 1916; that he had weighed the rods upon an engine of that class similar to the engine upon which the plaintiff worked, and that the larger rod weighed 410 pounds and one of the smaller rods weighed 156 and the other 157 pounds. He also gave testimony tending to show that if the work was done in a particular way, and by two men lifting one end of each rod together, they would while handling the heavier rod be lifting only 170 pounds, or 85 pounds to the man, and that by pursuing the same course with reference to the smaller or lighter rods the two men would lift only about 75 or 80 pounds, or not over 40 pounds each. It was also shown that about 15 years before that time the plaintiff had sustained a serious injury, by which the pubic bone on one side was crushed in, thereby rendering it probable that continuous heavy lifting would produce such an injury as the one he sustained on the occasion in question.

The foregoing constitutes, in substance, all the testimony relating to the question of the defendant's negligence in failing to furnish sufficient help to do the work. It will be noted that the testimony does not disclose, with as much particularity as could be done, the exact manner in which the rods were handled by the plaintiff and Mr. Chapman. At one time the plaintiff said that the block and tackle "got away from them," while at another time he said they used those appliances in lifting the heavy rod. The testimony shows that the two men put the rods on a truck and hauled them to the place where they were to be lifted up. It is not shown that block and tackle were used in placing them upon the truck, nor is it shown that two men lifted one end at a time of any of the rods in placing them upon the truck, or in putting them in place on the engine. There was testimony tending to show that, in order to do the work without requiring too much physical strain upon the part of the workmen, it was necessary that it

should be done by more than two men; and that testimony, in connection with other evidence tending to show that the defendant's foreman was aware of the deficiency referred to, presented a question of the defendant's negligence, which question both parties had the right to have submitted to the jury.

The other contentions made on behalf of appellee, in justification of the action of the trial court in refusing to give the special charge which this court held should have been given, have received due consideration, but are not regarded as tenable.

[5] While it is true that after the court had overruled their contention to the effect that the evidence did not raise the issue of assumed risk appellant's counsel, at the request of the court, wrote that portion of the charge given by the court, and stated to the court that they regarded it as a sufficient charge upon that subject, still, inasmuch as they thereafter requested the court to give the special charge which was refused and which supplied an omission in the other charge, we do not think it should be held that appellant invited the court to commit the error complained of. In other words, the formal approval by appellant's counsel of the court's charge upon that subject ought not to be construed as requesting or inviting the court to refuse a special charge subsequently requested by them and supplying an omission in the court's charge. The assignment which we sustain does not complain of the main charge, but of the action of the trial court in refusing to give a special charge, which would have supplied a defect in the main charge. If it can be said that appellant's counsel invited the court to write its main charge in the form it was written, it seems to us that it should also be held that they invited the court to supplement and correct an omission in that charge, by giving a special charge, which was requested and refused. Counsel for appellee also makes some objections to the form of the refused instruction, all of which are regarded by this court as untenable.

On account of the errors pointed out in our former opinion, the judgment of the trial court is reversed, and the cause remanded.

Reversed and remanded.