## WICHITA FALLS & S. R. CO. v. WADE.

### No. 12748.

Court of Civil Appeals of Texas. Fort Worth.

Dec. 24, 1932.

Rehearing Denied Feb. 18, 1933.

Bullington, Humphrey & King, of Wichita Falls, for appellant.

E. W. Napier, of Wichita Falls, for appellee.

DUNKLIN, Justice.

J. A. Wade instituted this suit against the Wichita Falls & Southern Railway Company and the Wichita Falls & Southern Railroad Company, to recover damages for injuries alleged to have been sustained by him which, according to allegations in his petition, resulted from a fall while he was walking along a pathway leading from the roundhouse and shops maintained by defendants for the purpose of repairing and servicing their locomotives, and in which shops he was employed as a boiler washer.

According to allegations in his petition, the cause of his fall was the slipping of his feet on ice formed from water which had escaped from a vat maintained by the defendants near the door of the blacksmith shop and used for cooling irons. He alleged that at the time of his injury he was engaged in the employment of defendants and was in the performance of his duties as a boiler washer at the roundhouse; that about 8 o'clock in the evening of January 8, 1930, and when he fell, he was walking from the roundhouse to a scrap pile situated near the roundhouse on the premises of defendant; and that as a result of his fall he sustained a fracture of

his backbone, which has caused him great physical pain and has totally and permanently incapacitated him for earning a livelihood by physical labor as he had done before the injury. He further alleged that on the night of the injury the weather was very cold, and by reason of the fact that the premises were dark and without lights he was unable to discover the ice upon which he slipped; that the path he was traveling was the one in common use by the defendant's employees; that the vat referred to was lower at one end than at the other and on account thereof water overflowed from it and ran down and formed the pool which froze. It was further alleged that defendant was guilty of negligence in maintaining the premises in that condition, which was an unsafe place to work.

Both defendants filed answers to the suit, and upon a final trial judgment was rendered denying plaintiff any recovery against defendant Wichita Falls & Southern Railway Company, of which no complaint is made here, but awarding him a judgment against the defendant Wichita Falls & Southern Railroad Company for the sum of $20,000. From this judgment that defendant has prosecuted this appeal, and it is the only defendant hereinafter referred to in this opinion.

In addition to a general demurrer and several special exceptions, the defendant filed a general denial and also a special answer, alleging that it maintained the roundhouse and shops on its premises and the blacksmith shop mentioned in plaintiff's pleadings, and that at the time of his alleged injury he was in the employment of defendant as a boiler washer and was engaged in the service of washing out boilers and engines used by defendant in hauling cars and passengers in interstate commerce and therefore his alleged cause of action, if any he has, arose under the Federal Employers' Liability Act (45 USCA §§ 51–59).

The answer of defendant contained further allegations in substance that plaintiff was furnished a safe place to work in the roundhouse with proper tools and equipment, well lighted and well heated, and free from any defects or hazards; that of his own choice, and not under defendant's direction, plaintiff elected to go outside of the roundhouse to a place where he was not required to go in the discharge of his duties and there hunt for a piece of pipe which he had himself provided for his own convenience but which was not necessary to the performance of his duties; that he voluntarily chose the route he traveled rather than another path in use by its employees which was free from ice and snow, and that if injured at all as alleged, the injury was the result of his own deliberate selection of a way and means in which to do his work; that the dangerous condition of those premises, if any, was open and obvious to the plaintiff and he was

charged with knowledge thereof and by reason thereof he assumed the risk of injury therefrom; that the presence of snow and ice developed in the progress of the work and was a condition necessarily incident to such work, and, therefore, a danger which plaintiff assumed as an ordinary and obvious risk of his employment.

There was a further plea of contributory negligence upon the part of plaintiff based upon the facts set forth in the pleadings just noted.

The record shows uncontroverted proof of the following facts: It was plaintiff's duty to wash boilers of defendant's engines, and in order to do so it was necessary to unscrew certain plugs in the boilers; no one was superintending or directing the manner of doing his work; he was furnished a helper in one Y. V. Sanchez, who was subject to his directions; the inside of the roundhouse was warm, well lighted, and a suitable place to work; defendant furnished him all wrenches of various sizes and nozzles necessary to do his work; some time prior to the night when he claims to have been injured, he took a piece of scrap pipe, about 2½ to 3 feet long and 1¾ inches in diameter, flattened it at one end so that it would fit over the end of a wrench and thereby give him more leverage to unscrew the plugs in the boilers; he had selected and fashioned the pipe of his own volition and without any instruction from the defendant or any of its representatives; but by using it he could unscrew the plugs; according to his testimony, defendant's superior officer knew of his use of the pipe some time before the alleged accident, and it had been used also by the boiler washer who worked in the daytime. Shortly after plaintiff had gone to work in the roundhouse on the night of January 8, 1930, he missed the iron pipe so used by him, and being unable to find it in the roundhouse where he usually kept it, he concluded that the clean-up boy had thrown it into the scrap pile where numerous pieces of scrap pipe had been deposited and which was north and west of the roundhouse, a distance of about 235 feet. He then started for the scrap pile in order to recover the piece of pipe which he had used; and he testified that he slipped on the ice while on that errand at a place near the blacksmith's vat, where he had previously seen a wet place and the next morning saw icicles on the rim of the vat, and the vat was the only source from which the ice on which he fell could have originated; he was fifty-seven years of age and had worked for defendant as boiler washer for about five years.

Registrations of the weather bureau at Wichita Falls showed that it was sleeting and snowing during the day of January 8, 1930, and a temperature of 22 degrees at 5 o'clock in the evening of that day, with a minimum during the night of that day of 17 degrees. The night was dark and cloudy, and the

premises where plaintiff alleged he fell were dark, but he carried his torch, used in the roundhouse for inspecting boilers, consisting of a bowl that would hold a pint of oil in which there was a piece of iron pipe, and a wick through that pipe furnished the light, which was not protected by any chimney, and in the wind that was blowing it furnished "just an old flicker light," as he described it. He further testified:

"Q. You could not see the ground. You could see what was on top. You could see that by stooping over. You had light—you could find what you were looking for. * * * A. I did not know that there was any ice about there, and I knew that there was snow on the ground, but I wasn't figuring that snow was very slippery. * * *

"Q. How long had this old vat been there? A. I guess that it had been there for two or three years, maybe longer than that.

"Q. Was it a leaky box? A. It was leaking, yes.

"Q. Had you ever seen that box leak or overflow before? A. Yes, I had never seen it, but of a morning in the summer time or in the fall, we would go out that way sometime in the morning, going to the car line, and we would get in the water there and we knew where it came from. There was nothing else for it to come from but that old box.

"Q. You would get in the water? Do you mean that you would have to go through a pool of water? A. Go through a little pool of water to get out to the track.

"Q. Now, how long had it been since you had seen that leaking, water leaking and overflowing there? A. It had been a month or more since I had been out there and noticed that thing leaking water out there. * * *

"Q. Was there a pathway leading from the blacksmith shop door to this office? A. Yes, sir, there was a pathway leading from the blacksmith shop door to Mr. Shull's office—there was a little trail there. * * *

"Q. What was it, was it a cinder path? A. A cinder path.

"Q. Who used that path? A. All of the day men used it. In going to Mr. Shull's office and back to the roundhouse, it was just a continual go all day long."

He further testified with reference to the pipe he used as follows:

"Q. This pipe that you had, that was something you had collected for yourself? A. It was something that I had collected for myself, in order to relieve these plugs the easiest way possible. It was a piece of pipe about 2½ or 3 feet long and about 1¾ inches thick.

"Q. How did you make that pipe fit? A. I would take it to the anvil and mash it.

"Q. How long did it take to do that? A.

Oh, it did not take but a little bit to do that. A little longer than a minute, because you had to try your wrench in it to get it right. It wasn't much trouble to do that.

"Q. It wasn't near as much trouble as to go out to the scrap pile? A. It wasn't as much trouble. I could have made it before I could have went to the scrap pile and got back, if I had a piece of pipe. * * *

"Q. And I believe that you also told me that when it was missing, it made you mad? A. Yes, it sure did. I ought not to have said that before. I was sure riled. * * *

"Q. There was some pipe there? A. Yes, sir.

"Q. You had a hack saw in the building? A. Yes, sir.

"Q. And you could have cut a piece of pipe? A. I could have done it.

"Q. And nobody ordered you to go out there into the dark on that ground and around about the scrap pile to try to find that piece of pipe? A. Nobody told me to go. I went on my own accord, hunting my pipe. I guess I was walking pretty peart.

"Q. Don't you think that is pretty dangerous to step pretty peartly on ice and snow? A. We never think about a thing like that, working around the roundhouse.

"Q. You knew it was pretty risky, didn't you? A. Yes, I knew it was risky.

"Q. Now, of course, you know as well as anybody else, don't you Mr. Wade, that it is a whole lot more dangerous to go around in the dark than it is with a light? A. Yes, it is more dangerous, but I had my old torch and I thought that it would keep lit, maybe. I had had that torch a long time. I knew the kind of light that it gave, and I knew how they would blow out.

"Q. Was it (the wind) blowing hard? A. It was blowing hard when I went out, and the wind whipped around in there.

"Q. When you stepped out of the door how far did you go before you knew that the wind was blowing? A. I did not get far away.

"Q. But you did not turn around and go back when you discovered that the wind was blowing hard? A. No, sir."

According to his testimony no one else saw him fall, and although he suffered pain at the time he continued working and did not realize the seriousness of his injury for some time thereafter, when he was compelled to cease laboring.

According to the testimony of physicians, based on X-ray tests and the truth of which appellant does not challenge, he is now suffering from a fractured spine, which is permanent and which has destroyed his ability to work in the future; although appellant denies that that condition was caused as alleged by him.

The jury, before whom the case was tried, returned special findings, including the following:

1. Plaintiff sustained an injury to his back on or about January 8, 1930, by a fall on ice while attempting to go from the roundhouse to the scrap pile to find the piece of pipe which had been fashioned by him for use in doing his work, and was following a route intended by defendant for his use in doing his work.

2. The ice upon which he fell was caused by overflow and leakage from the vat of water near the door of the blacksmith shop.

3. The piece of pipe was reasonably necessary in the work in which plaintiff was engaged, and a reasonably prudent person in plaintiff's situation would have gone to the scrap pile for the purpose of recovering the pipe he had been using.

4. The north end of the water vat was lower than its south end, and defendant was guilty of negligence in maintaining the vat in that leaky condition.

5. Defendant's employees were also guilty of negligence in putting water in the vat on or about January 8, 1930.

6. Defendant knew of the presence of the ice a sufficient length of time to have removed the same by the use of ordinary care before plaintiff sustained his injury, and was guilty of negligence in failing to so remove it.

7. Defendant was also negligent in failing to discover the ice before plaintiff's fall and injury.

8. Plaintiff has sustained damages by reason of his injury in the sum of $20,000, which resulted solely from the injury to his back sustained by him on January 8, 1930, from falling on the ice.

9. There was a further finding of damages at the rate of $15 a week for nurse hire from and after November 16, 1931, but the court refused to allow him a recovery therefor and cross-assignments have been filed by him here to the refusal of that additional relief.

10. In answer to special issues requested by defendant, the jury found that the slippery condition of the premises intervening between the roundhouse and scrap pile was not obvious and apparent to plaintiff and that a person of ordinary prudence, situated as was plaintiff, would not necessarily have learned of that slippery condition, and that plaintiff in leaving the pathway leading from the door of the roundhouse to the office and taking another route was not guilty of negligence; that plaintiff did not know that the ground was covered with ice and sleet when he attempted to go to the scrap pile from the roundhouse.

11. The piece of pipe for which plaintiff was searching when he started to the scrap pile was not selected by him for his own convenience, and he could not have obtained another piece of like character without going out of the roundhouse on the night in question.

There were further findings in favor of plaintiff in answer to special issues requested by the defendant presenting different phases of contributory negligence which were to the same effect as those noted above.

There were further issues as to whether or not the contributory negligence of the plaintiff in several particulars, if the jury should find there was any such, proximately contributed to his injury, and to each and all of those issues the jury answered, "No."

The jury further found that the negligence of defendant and its employees so found by them was in each particular a proximate cause of plaintiff's injury.

In the absence of a challenge thereof by appellee, we accept as true the statement in appellant's brief that the evidence showed that plaintiff and defendant were engaged in duties involved in interstate commerce and that the Federal Employers' Liability Act must control.

We quote the following from Labatt on Master & Servant, vol. 4 (2d Ed.) p. 4987: "In dealing with the issues of the negligence of the master or the contributory negligence of the servant there is always a preliminary question to be determined by the trial judges, viz., whether there is any evidence on which the jury can properly find in favor of the party on whom the onus of proof lies."

In the footnote to that text the following is quoted from Griffith v. Wapello Coal Co., 145 Iowa, 577, 122 N. W. 581: "In the absence of any evidence whatever that reasonable prudence required the installation of a derailing switch, and that, had such switch been maintained, it could have been operated practically so as to prevent the injury to deceased, there was nothing to go to the jury on this assignment of negligence." Other decisions cited are to the same effect.

The case of Missouri Pacific Ry. Co. v. Aeby, 275 U. S. 426, 48 S. Ct. 177, 179, 72 L. Ed. 351, was a suit by Mary I. Aeby to recover damages for injuries sustained as the result of an accumulation of snow on the platform of the station which concealed a hole into which plaintiff stepped. Plaintiff was in charge of the railroad station where the accident occurred; and in the necessary discharge of her duties she went out on the platform to place a truck for receipt of mail, baggage, and express. It was then dark and there were no lights on the platform. Rain had fallen and frozen and the snow covered holes in the ice into which she stepped without knowledge of their presence. We quote the following from the opinion of the Supreme Court in that case: "Its duty in re-

spect of the platform did not make petitioner an insurer of respondent's safety; there was no guaranty that the place would be absolutely safe. The measure of duty in such cases is reasonable care, having regard to the circumstances. * * * The petitioner was not required to have any particular type or kind of platform, or to maintain it in the safest and best possible condition. * * * No employment is free from danger. Fault or negligence on the part of petitioner may not be inferred from the mere fact that respondent fell and was hurt. She knew that it had rained and that the place was covered with ice and snow. Her knowledge of the situation and of whatever danger existed was at least equal to that chargeable against the petitioner. Petitioner was not required to give her warning. * * * It is a matter of common knowledge that almost everywhere there are to be found in public ways and on private grounds numerous places in general use by pedestrians that in similar weather are not materially unlike the place where respondent fell. Under the circumstances, it cannot reasonably be held that failure of petitioner to remove the snow and ice violated any duty owed to her. The obligation in respect of station platforms and the like owed by carriers to their passengers or to others coming upon their premises for the transaction of business is greater than that due their employees accustomed to work thereon. The reason is that the latter, familiar with the situation, are deemed voluntarily to take the risk of known conditions and dangers. * * * The facts of this case when taken most favorably to the respondent, are not sufficient to sustain a finding that petitioner failed in any duty owed to her. * * * As negligence on the part of the petitioner is essential, we need not consider its contentions in respect of assumption of risk and negligence on the part of respondent."

In St. Louis, I. M. & S. Ry. Co. v. Schultz, 115 Ark. 350, 171 S. W. 876, 878, in denying plaintiff a recovery for injuries, the court had this to say:

"The master owes to the servant the duty of exercising ordinary care to make safe the place designated for the servant to do his work, but this duty extends to such parts of the premises only as the master has designated and prepared for the occupancy of the servant while performing his work according to the methods prescribed for doing the same, and to such other parts of the premises as the master knows, or by the exercise of ordinary care should know, that the servant is accustomed to using while performing his duties.

"But where the servant adopts methods for his own convenience contrary to the methods expressly prescribed by his employer, and where the servant occupies places about the premises in the performance of his duties that the master could not reasonably anticipate that the servant would occupy, then the master owes the servant no duty to make those places or methods safe, and his failure to do so is not actionable negligence." Citing authorities.

■ To the same effect are the following decisions: Hettich v. Hillje, 33 Tex. Civ. App. 571, 77 S. W. 641, writ of error refused; St. L. & S. W. Ry. Co. v. Highnote, 99 Tex. 27, 86 S. W. 923; Patton v. T. & P. Ry. Co., 179 U. S. 658, 21 S. Ct. 275, 45 L. Ed. 361; Del. L. & W. Ry. Co. v. Koske, 279 U. S. 7, 49 S. Ct. 202, 73 L. Ed. 579; St. L. & S. F. Ry. Co. v. Mathis, 101 Tex. 342, 107 S. W. 530. See, also, Joske v. Irvine, 91 Tex. 574, 44 S. W. 1059; Garrett v. Hunt (Tex. Com. App.) 283 S. W. 489. And under the authorities cited we have concluded that the evidence was insufficient, prima facie, to sustain plaintiff's allegations or defendant's negligence.

■ It is a further rule that when negligence of the defendant for which a recovery is sought is established, the burden is upon plaintiff to further show that such negligence was the proximate cause of the injury complained of. Washington v. M., K. & T. Ry. Co., 90 Tex. 314, 38 S. W. 764.

Texas & P. Ry. Co. v. Bigham, 90 Tex. 223, 38 S. W. 162, 164, was a suit by Bigham to recover of the railroad company damages for personal injuries to himself as a result of being run over by a herd of cattle as they broke out of the gate of a pen in which they had been confined and which was furnished by the railroad company for that purpose, and also for damages sustained in the loss of cattle which escaped. The gate was out of repair, and it was held that the evidence was sufficient to show a right of recovery for the loss of the cattle for negligence in maintaining the gate in that condition. But it was further held that the cause of action for personal injury to the plaintiff was not sustained for lack of showing that the negligence charged in maintaining the gate with defective fastenings was the proximate cause of plaintiff's personal injuries. In that connection the court had this to say: "Ought the agents of the company to have foreseen that, as a result of the imperfect fastening of the gate, the injury, or any injuries similar in character, would probably result? In our opinion, nothing short of prophetic ken could have anticipated the happening of the combination of events which resulted in the injury of the person of the plaintiff. The act of the defendant in permitting the fastening to its gate to become insecure was in itself lawful; and since it was clearly out of the range of reasonable probability that an injury to the person of any one should result, it should be held as a matter of law that the negligence of the company gave no right of action for such injuries."

See, also, Gulf, C. & S. F. Ry. Co. v. Bennett, 110 Tex. 262, 219 S. W. 197, which cites with approval the Bigham Case and other decisions to a like effect.

■ The quotation from the Bigham Case is applicable to this case. In other words, it may be said that there is a lack of evidence reasonably tending to show that the defendant company should have anticipated the combination of events which resulted in the injury complained of; and therefore to show that the alleged unsafe condition of the premises was the proximate cause of plaintiff's injury.

■ The undisputed facts in this case show that prior to his alleged injury plaintiff knew of the leakage of the water vat near the blacksmith shop and the course of its flow over the adjacent premises. He also knew, or must necessarily have known in the exercise of proper care for himself, of the freeze, and that any overflow from the vat would likely freeze and accumulate in the pathway which he followed while attempting to reach the scrap pile. He also knew that by reason of the darkness he would not be able to see the condition of the pathway he traveled. The place assigned to him for work was within the shops where tools were furnished to him by the master, and there was no fact or circumstance in the evidence which tended to prove, even remotely, that the master was put on notice that the plaintiff would have occasion to use the premises where he claims to have been injured for the purpose of searching the scrap pile for the lost tool which he himself had prepared, notwithstanding defendant's knowledge of his prior use of that tool and of the fact that it enabled him to better perform the services of his employment. And under such circumstances, tested by the rule announced in the foregoing decisions, supplemented by the decisions of St. Louis S. W. Ry. v. Hynson, 101 Tex. 543, 109 S. W. 929, and Bonnet v. G. H. & S. A. Ry., 89 Tex. 72, 33 S. W. 334, decided before the defense of assumed risk of the negligence of a railroad company was barred by article 6437, Rev. Civ. Statutes, we believe that the defense of assumed risk was conclusively established, independently of the issue of defendant's negligence.

From the foregoing conclusions it follows that the court erred in refusing the defendant's request for an instructed verdict.

■ Appellant urgently insists that the evidence was insufficient to show that plaintiff's injury of which he complained was caused by falling on the ice, as claimed by him. That contention is based chiefly on the testimony of plaintiff himself, to the effect that after his fall he sat down at that place for several minutes, then went back to the boiler room, and after about 30 minutes his pain ceased sufficiently for him to resume his work, although he did not do much work that night, and laid off the next day; and continued to hold his job until December 27, 1930, nearly one year from the time of his alleged fall, and never complained to his employer that he had been injured until in January, 1931, after he had quit the employment, and never told his physician who had been treating him for illness since the year 1928 of receiving such an injury, and never put in a claim for indemnity with the Accident Insurance Company, with whom he carried an accident policy. But he further testified that he told several persons of having sustained the injury complained of, one of whom was Y. V. Sanchez, his helper, who was not offered as a witness upon the trial, although he was sworn and put under rule as a witness.

We overrule this assignment, but we have noted it and the foregoing testimony to show the materiality of other assignments to alleged improper arguments; one of which was to remarks of plaintiff's counsel in his argument to the jury which is shown in a bill of exception as follows:

"Now you may disbelieve Wade and his wife, and I am going to tell you that the strongest circumstance, and the one that you cannot get away from is the fact that he was hurt and told Mr. Y. V. Sanchez—and where is Y. V. Sanchez? Why, he is working out there and on their pay roll, drawing their money—they could get him here at the courthouse, but you did not hear him testify—

"Mr. Humphrey: We object to that argument. He was a witness up here and as the court well knows and Mr. Napier well knows, subject to subpœna, and we object to that argument as highly prejudicial and improper.

"The Court: Objection overruled.

"Mr. Humphrey: Note our exception.

"Judge Napier: Now, would not I have been silly to have brought their employee here to testify, one of two things would have happened: If he had helped me he would have lost his job, and the chances are that he might not have helped me.

"I do not know; but if they had put him on the witness stand, then I would have a chance to cross examine him. If I put him on the stand, I cannot ask him leading questions, and I am bound by every word that he says, and if he tells something else, you know, it is just like buying a pig in a poke, and of course lawyers just don't do that, and it was foolish. But he was here, and if they wanted to know the truth about this thing, they could have put him on the stand, and when old man Wade said under oath, 'I told Sanchez that,' the thing for them to have done was to put Sanchez on the stand and asked him 'Mr. Sanchez did Mr. Wade tell you that night that he fell and hurt his back?'

"Did he tell you that he went out on the ice on January 8, 1930, and fell and hurt his

back? That is what they would have done unless they knew that statement there shows and they know what that statement was—

"Mr. King: We object. There is no evidence here of any statement of Sanchez.

"Mr. Napier: I will withdraw that remark about the statement. Maybe they did not take the statement.

"Mr. King: We ask to have a bill to all of this and ask to have the jury instructed that they are not to consider it.

"Mr. Napier: I withdraw the statement. There is no evidence they got a statement from Sanchez. Mr. Wade talked to Sanchez—

"Mr. King: Our bill goes to all of this as improper and prejudicial—outside of the record and wholly improper argument.

"The Court: You may have your bill.

"To which argument and statements of plaintiff's counsel defendant then and there in open court excepted for the reasons and objections stated above, as the facts showed that the witness Y. V. Sanchez was present at the trial of the case, was in attendance upon the court, was sworn as a witness for defendant in the case by the court and placed by the court under the rule.

"Which objections the court then and there overruled and permitted plaintiff's counsel to argue as aforesaid."

By another assignment complaint is made of a further argument of plaintiff's counsel to the jury to which defendant objected at the time, and which objection was overruled by the court, as follows:

"Now this court gives you some definitions —gives you a definition of proximate cause.

"You will find that there are some issues in here which you ask to determine whether certain things was the proximate cause of this man's condition, and who is responsible. What the court wants to find out here is who is responsible for this man's condition.

"That is not the legal definition but that is about what that issue means, so you be very careful before you sign any verdict, which finds old man Wade guilty of any kind of negligence. * * *

"Now, Gentlemen, I haven't time to discuss all of these issues, but I am going to tell you now that these issues in which the court asks you if something that old man Wade did was a proximate cause or a sole cause or any sort of cause, I am going to tell you now that you ought to be very careful, and you ought to know what you are doing when you sign a verdict that answers those issues, each of those issues."

We have concluded that those assignments also should be sustained. Robbins v. Wynne (Tex. Com. App.) 44 S.W.(2d) 946, and decisions there cited; 3 Texas Jurisprudence, p.

1260, and decisions noted. The statement as to the legal significance of the term "proximate cause" in the argument last quoted, of itself, constitutes reversible error under the decision in Bell v. Blackwell (Tex. Com. App.) 283 S. W. 765, which has been frequently cited with approval in opinions of our Supreme Court and Commission of Appeals; and injury to appellant was all the more probable in view of the action of the trial judge in overruling the objection to that argument urged when it was made.

For the reasons noted, the judgment of the trial court is reversed, and judgment is here rendered that appellee take nothing of appellant by reason of this suit; and for the same reasons appellee's cross-assignments of error are overruled. The judgment in favor of the Wichita Falls & Southern Railway Company is left undisturbed.